HEERDE LAW PLLC
Matthew C. Heerde
48 Wall Street 31st Floor
New York, NY 10005
E: mheerde@heerdelaw.com
P: 347-460-3588
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IBRAHIM ALMIMEH, PUPCULTURE LLC, PUPCULTURE DUMBO LLC, PUPCULTURE FIDI LLC, PUPCULTURE TRIBECA LLC, PUPCULTURE UWS LLC,<br><br>        *Plaintiff,*<br><br>    vs.<br><br>AJA PACK HOLDINGS INC. f/k/a PELLA SOLUTIONS INC., JOSHUA MARX, and ALEX KLEIN,<br><br>        *Defendants*. | **COMPLAINT** |

As and for his complaint against defendants AJA Pack Holdings Inc. f/k/a Pella Solutions Inc., Joshua Marx, and Alex Klein, plaintiffs Ibrahim Almimeh (**"Mr. Almimeh"**) and PupCulture LLC, PupCulture DUMBO LLC, PupCulture FIDI LLC, PupCulture Tribeca LLC, PupCulture UWS LLC, and PupCulture Inc., (the "**PupCulture Entities**", and collectively, with Almimeh, "**Plaintiffs**"), by and through their undersigned attorneys, allege as follows:

**INTRODUCTION**

1.      This action arises out of Defendants' securities fraud, common law fraudulent inducement and other wrongful conduct in connection with Defendants' July 15, 2024 purchase of Plaintiffs' doggy day care business assets, for which Defendants paid in part with stock

options in defendants' small private equity firm, AJA Pack Holdings Inc. ("**AJA Pack Holdings**").

2.     Defendants Alex Klein and Joshua Marx—seasoned mergers and acquisitions professionals with extensive backgrounds in finance—have made a practice of deceiving unsophisticated doggy day care entrepreneurs like Plaintiff Ibrahim "Abe" Almimeh.

3.     As alleged in more detail below, in the months leading up to the July 15, 2024 closing of the asset purchase, Messrs. Klein and Marx repeatedly lied to Mr. Almimeh orally and in writing about the value and exercise mechanism of the stock options AJA Pack Holdings in order to obtain a steep and ill-gotten discount in the purchase of Mr. Almimeh's business assets. Moreover, in furtherance of their scheme to defraud Plaintiffs (and in order to sow the seeds of even more fraudulent schemes), Messrs. Klein and Marx continued their pattern of lies to *other* doggy day care owners as they sought to purchase other businesses through AJA Pack Holdings.

4.     Mr. Almimeh had founded his doggy day care business—PupCulture—in 2002, just a few years after immigrating from Amman, Jordan to New York City at age 22.  PupCulture was Mr. Almimeh's life's work and the sole means by which he provided for his family in New York and back in Jordan.

5.     In late 2023, Defendants approached Plaintiff Almimeh with a proposal for purchasing PupCulture, which by then had grown into five doggy daycare locations Manhattan and Brooklyn.[1]  Defendants at that time proposed to Mr. Almimeh that, in exchange for the sale of the PupCulture assets, AJA Pack would pay a Plaintiffs total of $6.7 million in cash and an outright common stock in AJA Pack Holdings.

---

[1]  Defendants' buyout proposal came in the midst of a trend in private equity investment in pet care. *See* https://www.themiddlemarket.com/news-analysis/booming-doggy-day-care-attracts-pe-pack

6. That initial purchase proposal, however, was meant only to set up Mr. Almimeh at the beginning of what turned out to be Defendants' months-long fraudulent scheme to fleece him of millions of dollars. After conveying that initial December 2023 proposal, and over the next several months before the parties executed an Asset Purchase Agreement in March 2024, Defendants shrank the cash component of the proposed purchase consideration and substituted the outright stock grant with a grant of stock options.

7. Critically, as described in more detail below, as Defendants repeatedly modified the size and nature of the purchase consideration, Defendants also inundated Mr. Almimeh with a flood of lies about the value and nature of the stock options that were promised as part of the purchase price.

8. Specifically, Defendants made two key misrepresentations to Plaintiffs.

9. First, Defendants misrepresented the *value* of the stock options. Defendants told Mr. Almimeh that the options to be granted as purchase consideration for the PupCulture assets had a dollar value of $2.1 million and represented that options to be granted as part of Mr. Almimeh's employment consideration had a dollar value of $300,000. To the contrary, however, and as Mr. Almimeh only learned after the asset purchase closed on July 15, 2024, the stock options' value was in fact far, far less than a total of $2.4 million, and was indeed close to zero.

10. Second, Defendants misrepresented the nature of the *exercise mechanism* for the stock options. Defendants told Mr. Almimeh he need not pay out of pocket in order to convert his options into common stock in AJA Pack Holdings. To the contrary, however, and as Mr. Almimeh only learned in late 2025, Defendants in fact intended Mr. Almimeh pay Defendants handsomely in order to exercise those options.

11. Critically, the asset purchase agreement documents themselves made no representations as to the value of the stock options and omitted any information about the

3

underlying value of AJA Pack's common stock. And critically, the asset purchase agreement documents were rife with vague and confusing language that rendered them susceptible to Defendants' oral misrepresentations about the stock options' exercise mechanism.

12. Mr. Almimeh only came to realize Defendants' fraud after the July 15, 2024 closing, when Defendants finally revealed the dollar value of stock in AJA Pack Holdings, and when Defendants contradicted their pre-closing representations and the plain language of the controlling agreements about the method of exercising those options.

13. When Mr. Almimeh in the months after the July 15, 2026 closing started to understand the fraud to which he had been subjected, he was in utter shock and dismay. Before signing the APA, Defendants had made it clear to him they believed PupCulture was worth no less than $5,805,500. And before the July 15, 2024 Closing, Defendants had represented over and over again that Mr. Almimeh would receive cash and stock options with a total value of $5,805,500. But Defendants had in fact provided purchase consideration whose value was far less than $5,805,500—about $2.4 million less.

14. After his realization of Defendants' fraud, Mr. Almimeh approached Defendants with demands they compensate him for their deception and for the enormous financial loss they inflicted. Defendants responded primarily by defaming Mr. Almimeh to his former PupCulture employees, by leveling against him false allegations of workplace misconduct, by terminating his family's health insurance, by terminating his employment with AJA Pack Holdings Inc., and by shutting him out of the business he nurtured for decades.

15. Mr. Almimeh thus comes to this Court to seek redress for Defendants' cold-hearted and ruinous fraud. When Defendants deceived Mr. Almimeh into sellling the PupCulture assets in exchange for securities in AJA Pack Holdings, Defendants defrauded him

4

of no less than $2.4 million, took advantage of his lack of sophistication, and stole from him all he had built.

16.    Plaintiffs ask this Court to adjudge Defendants liable for securities fraud and common law fraudulent inducement, among other causes of action, so that Defendants are made to pay Mr. Almimeh the full value of his business, which Defendants had represented Mr. Almimeh would receive and which the business that Defendants now own and operate off the back of Mr. Almimeh's lifelong work.

**PARTIES**

17.    Plaintiff Ibrahim Almimeh is a resident of the State of New Jersey, and was the owner of the PupCulture entities, which were dissolved in 2025.  Mr. Almimeh and the PupCulture entities owned the "PupCulture" business and its assets that Plaintiffs sold to Defendant AJA Pack Holdings Inc. f/k/a Pella Solutions Inc. at the closing on July 15, 2024.

18.    PupCulture LLC was a New York limited liability company, dissolved in June 2025, and was the lessee of Plaintiffs' doggy day care location in the SoHo neighborhood of Manhattan and was one of the sellers of the PupCulture business assets in the Closing.

19.    PupCulture DUMBO LLC was a New York limited liability company, dissolved in June 2025, and was the lessee of Plaintiffs' doggy day care location in the DUMBO neighborhood of Brooklyn and was one of the sellers of the PupCulture business assets in the Closing.

20.    PupCulture FIDI LLC was a New York limited liability company, dissolved in June 2025, and was the lessee of Plaintiffs' doggy day care location in the financial district of Manhattan and was one of the sellers of the PupCulture business assets in the Closing.

21.    PupCulture Tribeca LLC was a New York limited liability company, dissolved in June 2025, and was the lessee of Plaintiffs' doggy day care location in the TriBeCa

neighborhood of Manhattan and was one of the sellers of the PupCulture business assets in the Closing.

22.     PupCulture UWS LLC was a New York limited liability company, dissolved in June 2025, and was the lessee of Plaintiffs' doggy day care location on the upper west side of Manhattan and was one of the sellers of the PupCulture business assets in the Closing.

23.     Defendant AJA Pack Holdings Inc. (hereinafter "**AJA Pack Holdings**") is a Delaware corporation that purchased the PupCulture business assets at the July 15, 2024 Closing. At the time of the Closing and during all events alleged herein, AJA Pack Holdings was named Pella Solutions Inc.  AJA Pack Holdings is not registered to do business in the State of New York, but AJA Pack Holdings's principal place of business is New York City.

24.     Defendant Joshua Marx is a resident of New York City and a citizen of the State of New York and at all relevant times was the Chief Executive Officer and partial owner of AJA Pack Holdings.

25.     Defendant Alex Klein is a resident of New York City and a citizen of the State of New York and at all relevant times was the President and partial owner of AJA Pack Holdings.

26.     Mr. Klein and Mr. Marx together own the majority of the shares in their small private equity company, Defendant AJA Pack Holdings.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa, because this action arises under Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C § 78j) and its implementing regulation Rule 10b-5(a)-(c) (17 C.F.R. § 240.10b-5), and because Plaintiffs' state law claims arise from the same controversy.

28.     This Court has personal jurisdiction over all Defendants.  Each of the three defendants are citizens of the State of New York, and each of the three defendants transacted business in the State of New York in connection with the wrongdoing alleged in this Complaint.

29.     Venue is proper in this district pursuant to 28 U.S.C § 1391(b)(2), because a substantial part of the acts or omissions giving rise to this Complaint occurred in this district.

## FACTS

### *In Late 2023, Defendants Approach Mr. Almimeh to Purchase the PupCulture Assets*

30.     Mr. Almimeh built PupCulture and its doggy day care business from scratch, having founded it in 2002, a few years after immigrating to New York from Amman, Jordan. PupCulture was Mr. Almimeh's life's work and the only means of support for his family both here in New York as well as back in Jordan.

31.     By 2023, Plaintiff Almimeh had for more than 20 years owned the PupCulture entities and operated the PupCulture business.  By 2023, there were five PupCulture doggy day care locations—four in Manhattan and one in Brooklyn.

32.     In late 2023, Defendants Joshua Marx and Alex Klein approached Mr. Almimeh with a proposal for AJA Pack to buy the PupCulture business.

33.     Specifically, on or around December 18, 2023, Defendants sent Mr. Almimeh a letter of intent ("**LOI**") proposing an asset purchase pursuant to which AJA Pack Holdings would purchase all the PupCulture business assets for a price of $6.7 million, including $4.6 million in cash and a grant of common stock in AJA Pack Holdings with a what Defendants represented would be a value of $2.1 million.

34.     Mr. Almimeh was impressed with Defendants' operation.  Mr. Marx and Mr. Klein had extensive backgrounds in finance and mergers and acquisitions and held degrees in economics from Yale University and University of Pennsylvania, respectively.  AJA Pack

Holdings' board of directors was chaired by Jide Zeitlin, the former chairman and CEO of Tapestry, Inc.—owner of brands like Coach and Kate Spade—and a former partner at Goldman Sachs.

35.     After sending the LOI, Mr. Marx arranged for Mr. Almimeh to meet with Mr. Zeitlin on January 30, 2024 at Mr. Zeitlin's Manhattan office.  At that meeting, Mr. Zeitlin lavished praise on Mr. Almimeh and the PupCulture business, encouraging Mr. Almimeh to be enthusiastic about Defendants' proposed deal.

36.     On or around February 5, 2024, Messrs. Marx and Klein met with Mr. Almimeh at the Nexus Club in lower Manhattan and explained to Mr. Almimeh that they were revising their proposal downward to a total purchase price of approximately $5.1 million, which included $3 million in cash, and an outright grant of common stock in AJA Pack Holdings that Defendants represented would have a value of $2.1 million.

### *In March 2024, Defendants Change the Stock Component of the Purchase Price to Stock Options and Misrepresent the Options' Value and Exercise Mechanism*

37.     In early March 2024, Mr. Almimeh met with Mr. Marx at the Beekman Hotel in lower Manhattan, and Mr. Marx proposed for the first time that instead of paying for the asset purchase with $3 million in cash and a grant of common stock, Defendants would instead provide Mr. Almimeh with $3 million in cash and, now, a grant of stock *options* that Mr. Klein and Mr. Marx represented had a value of $2.1 million.

38.     At this early March meeting at the Beekman Hotel, on behalf of himself and on behalf of AJA Pack Holdings, Mr. Marx told Mr. Almimeh the options would have "the same exact value as the stock."

39.     In addition to making false representations about the dollar value of the stock options, Defendants also made false representations about the exercise mechanism for the

options.  Mr. Marx told Mr. Almimeh at the March meeting at the Beekman hotel that Almimeh could "tap into the value of your equity at the end of the year if you need any liquidity" and thus could exercise the options without paying any cash out of pocket.

40.     On or around March 16, 2024, shortly after Defendants had changed the stock grant to a grant of stock options, Mr. Klein texted Mr. Almimeh and told him "my goal is to turn your $2.1M of Pella stock into 10M," giving Mr. Almimeh the understanding that the stock options ultimately represented the same value as outright common stock.

41.     Defendants made these misrepresentations in order to induce Mr. Almimeh to accept purchase consideration of far lower value than the PupCulture business and in order to give Mr. Almimeh the false understanding that he need not pay out of pocket in order to convert his options into common stock in AJA Pack Holdings.

### *The March 22, 2024 Deal Summary*

42.     On or around March 22, 2024, at another meeting in the Beekman Hotel, Mr. Marx and Mr. Klein presented Mr. Almimeh with a document entitled "Deal Summary" that outlined, among other things, the purported consideration AJA Pack Holdings proposed to pay to Plaintiffs as purchase consideration for the PupCulture assets.

43.     The Deal Summary stated that the purchase consideration Defendants would pay for the PupCulture assets included 981,344 options for stock in AJA Pack Holdings.

44.     The Deal Summary represented that these 981,344 options had a dollar value of $2,100,000.

45.     The Deal Summary stated that the value of the stock options was "$2,100,000 At Close."

46.     The Deal Summary described the *total* value of the total purchase price Defendants would pay to purchase the PupCulture assets as "Total Baseline Value: $5,805,500."

9

47.    The Deal Summary showed that Defendants calculated this $5,805,500 value by adding together:

- $2.7 million outright cash consideration;

- $300,000 cash for an SBA loan payoff;

- A purported $2,100,000 worth of stock options (981,344 options) granted at the Closing;

- A purported $300,000 worth of stock options (140,192 options) vesting over three years as consideration for Mr. Almimeh's upcoming employment with AJA Pack Holdings;

- $375,000 in cash salary paid over three years as consideration for Mr. Almimeh's upcoming employment with AJA Pack Holdings;

- $30,050 in employment benefits.

48.    The Deal Summary thus made clear Defendants' false representation that the 981,344 options had a dollar value of $2.1 million.

49.    The Deal Summary also made clear Defendants' false representation that the 140,192 options had a dollar value of $300,000.

50.    Mr. Marx emailed the Deal Summary to Mr. Almimeh after this meeting.

51.    The Deal Summary's representation that the 981,344 stock option component of the purchase price would have a value of $2.1 million was false, and Messrs. Klein and Marx knew the representation was false.

52.    The Deal Summary's representation that the 140,192 employment stock options would have a value of $300,000 million was false, and Messrs. Klein and Marx knew the representation was false.

53.    Messrs. Klein and Marx made these representations with the intent to conceal the true value of the stock options that Defendants were offering as consideration for the asset

purchase, in order to induce Mr. Almimeh into accepting purchase consideration of far lower value than the value of the PupCulture assets, and in order to give Mr. Almimeh the false understanding that he need not pay out of pocket in order to convert his options into common stock in AJA Pack Holdings.

*The March 27, 2024 Asset Purchase Agreement and Defendants' Continued Misrepresentations*

54. On or around March 27, 2024, the Plaintiffs and AJA Pack Holdings executed a written Asset Purchase Agreement ("**APA**") pursuant to which AJA Pack Holdings agreed to purchase the PupCulture business assets. The APA partially described the consideration for the asset purchase, including, among other consideration, "a stock option grant agreement for Nine Hundred Eighty One Thousand Three Hundred Forty Four (981,344) Buyer common shares."

55. The APA made no representation regarding the value of the stock options or the value of common stock in AJA Pack Holdings.

56. After execution of the APA and before the July 15, 2024 closing, Defendants continued to misrepresent to Plaintiffs the value of the stock options and the nature of the options' exercise mechanism.

57. At each of approximately eight in-person meetings at the Beekman Hotel in April, May, and June 2024, Mr. Marx continued to describe the stock options to Mr. Almimeh as "equity" and represented that the stock options "had the same value" as the $2.1 million worth of outright stock grant Defendants had originally proposed in their December 18, 2023 letter of intent. Mr. Klein was in attendance at two or three of these in-person meetings at the Beekman Hotel. At almost every one of the eight meetings, Mr. Marx also represented to Mr. Almimeh that Almimeh could "tap into the equity at any time if he needed liquidity" and could thus exercise the options without paying any cash. At each of the meetings that Mr. Klein attended,

11

Klein represented to Abe that "once the deal closes, you will be the third-largest shareholder" in AJA Pack Holdings.

58.    Starting April 2024 until June 2024, at close to 10 so-called "integration meetings" at 1 Liberty Plaza with Defendant Klein, Defendant Marx, as well as CFO Greg Miller, CMO Alec Goldman, as well as Plaintiffs' team, Mr. Almimeh, Jenny Orellana, Diana Chasijuan, Stephanie Galas, and Esther Choi, Defendant Klein represented to all in attendance that, "once the deal closes, Abe is going to be the third largest shareholder of the company."

59.    Over the months preceding the July 15, 2024 closing, Mr. Klein and Mr. Marx numerous times represented to Mr. Almimeh that, once the asset purchase closed, Mr. Almimeh "would be a 6% owner" in AJA Pack Holdings.

60.    At a meeting with Messrs. Klein and Marx in April 2024 at AJA Pack Holdings' office, Mr. Klein told Mr. Almimeh that Mr. Klein's father was "salivating over your shares" in AJA Pack Holdings.  Mr. Klein made this representation to further misrepresent to Mr. Almimeh that the stock option component of the purchase price had a value equivalent to $2.1 million and that at no further cost, Mr. Almimeh could exercise the stock options and obtain stock in AJA Pack Holdings, which he could then offer for sale for around $2.1 million.

61.    In a May 20, 2024 email to the landlord for the PupCulture DUMBO location, Mr. Marx represented to Two Trees Management and Mr. Almimeh that AJA Pack Holdings was purchasing the PupCulture assets by paying Abe partially in stock.

62.    On or around July 10, 2024, AJA Pack Holdings' attorneys presented a lease-assignment agreement to Plaintiffs and to PupCulture UWS LLCs landlord Durst Pyramid LLC, falsely stating that Mr. Almimeh at that time held a 4% ownership interest in AJA Pack Holdings.

63.    All of Defendants' misrepresentations about the value of the stock options and the nature of the options' exercise mechanism were intended to give Mr. Almimeh the understanding that upon request and at no further cost, Mr. Almimeh could exercise the stock options and obtain stock in AJA Pack Holdings, which he could then offer for sale for around $2.1 million.

64.    On several occasions between March 27, 2024 and the Closing on July 15, 2024, Mr. Almimeh requested AJA Pack Holdings provide him with documentation reflecting the value of AJA Pack Holdings' stock, but Mr. Almimeh's requests were ignored.

### *The Parties Close the Transaction, and Mr. Almimeh Discovers Defendants' Fraud*

65.    On July 15, 2024, Plaintiffs and AJA Pack Holdings Closed the PupCulture asset purchase.

66.    As part of the Closing, Mr. Almimeh and Mr. Marx for AJA Pack Holdings executed an Option Grant Notice and Agreement regarding the 981,344 options.

67.    The Option Grant Notice and Agreement stated, among other things, that the "Vesting Commencement Date" was July 15, 2024, and stated that "All Restricted Stock shall automatically deemed to be vested on the Vesting Commencement Date."

68.    The Option Grant Notice and Agreement also stated, among other provisions, that "Payment of the Exercise Price shall be by any of the following, or a combination thereof: … such other form of consideration and/or pursuant to such method as the Committee shall determine in its sole and absolute discretion, provided that such form of consideration and/or method is permitted by Section 5(b)(v) of the Plan and by applicable law."

69.    Days after the Closing, Defendants provided Mr. Almimeh with access to AJA Pack Holdings' profile on the Carta platform, where Plaintiffs saw for the first time the value of AJA Pack Holding's stock was indicated as $0.16 per share.  Mr. Almimeh became concerned, because converting 981,344 options into stock worth $0.16 per share would only yield about

$157,000 in value, far less than the $2.1 million in value that was described repeatedly by Defendants.

70.    Mr. Almimeh had trouble believing that Defendants would have misled him so egregiously.  Mr. Almimeh thus and initiated several meetings with Defendants as well as with Jide Zeitlin to investigate.

71.    In the months following the Closing, Defendants continued making misrepresentations to Plaintiffs about the value and nature of the stock options.

72.    In or around September 2024, while Mr. Almimeh and Mr. Marx were in an Uber traveling from one of Defendants' other doggy day care stores, Mr. Marx assured Mr. Almimeh that his "equity" in AJA Pack Holdings is "stronger than Alec Goldman's equity" referring to AJA Pack Holdings Chief Marketing Officer.

73.    At a September 2024 meeting at AJA Pack Holdings' office at 1 Liberty Plaza, Alex Klein stated to Mr. Almimeh, to Mr. Marx, to AJA Pack Holdings' Chief Financial Officer Greg Miller and to AJA Pack's Chief Marketing Officer Alec Goldman that once the asset purchase closed Mr. Almimeh "will be the third biggest shareholder in the company."

74.    A deepening rift in the partnership between defendants Klein and Marx, however, shed some light on Defendants' fraudulent scheme.

75.    At a one-to-one meeting between Mr. Klein and Mr. Almimeh on October 24, 2024 at Mr. Klein's office in lower Manhattan at 1 Liberty Plaza, Mr. Klein made statements to Mr. Almimeh about Mr. Marx confirming that Defendants lied to Mr. Almimeh during the negotiation of the APA and leading into the July 15, 2024 closing.

76.    Specifically, Mr. Klein stated: "He [Mr. Marx] lied to you.  He set your expectations out the window. …Along the way, every time you and I had to get on the phone it was because I was cleaning up a promise that was made to you that was bullshit. … If I put a gun

to your head and said 'How many things were told to you that weren't true, Alex versus Josh?' I'm going to guess that it's very, very obvious to you. … Along the way until we got the deal closed, how many times did I have to call you and say 'This is completely inappropriate?  He's a child.'"

77.     On October 30, 2024, Mr. Almimeh met again with Jide Zeitlin and suggested that he was considering "liquidating part of his equity".   In response, Mr.  Zeitlin advised Mr. Almimeh not to do so at that time, because AJA Pack Holdings was conducting business deals that would increase the value of Mr. Almimeh's interest in the company.

78.     On or around January 15, 2025, in proposing the potential for AJA Pack Holdings' purchase of another doggy day care business "Roosevelt Pup," Mr. Klein falsely represented to the proprietor of that business that Mr. Almimeh "is an owner of my business" and that "he owns 5% of my company now" as a result of the Asset Purchase Agreement, referring to AJA Pack Holdings.

79.     In or around March 2025, Defendant Klein falsely represented to the owner of another doggy day care business "Throw Me a Bone" that Mr. Almimeh is a "part owner of the company," referring to AJA Pack Holdings.

80.     In a July 16, 2025 letter, counsel for Defendants represented for the first time that the $2.14 exercise price indicated in the Option Grant Notice was the same as the $2.14 per share price paid by a recent investor in AJA Pack Holdings.

81.     On November 4, 2025, Mr. Almimeh sought to exercise 1,000 of the 981,344 options in the way Defendants had explained and as provided by the Stock Option Grant Notice and Agreement, i.e., without paying any cash outright.  Defendants responded that in order to exercise, Mr. Almimeh was required to pay $2.14 per option.

15

82.     Thus, contrary to what Mr. Marx and Mr. Klein had represented to Plaintiffs in the Deal Summary, in text messages, and in numerous in-person meetings, the value of the 981,344 stock options was not, in fact, $2.1 million, but was at or close to zero.  And contrary to what Mr. Marx had repeatedly represented to Mr. Almimeh, Mr. Almimeh could not, in fact, "tap into his equity" at any time, but would—if he wished to obtain stock through his 981,344 options granted under the APA—be *himself required to pay* $2.1 million to Defendants.

83.     Had Defendants' not used their misrepresentations about the stock option value and exercise mechanism to induce Plaintiffs to execute the asset purchase, Plaintiffs would have demanded additional consideration so that the purchase price was commensurate with the $5,805,500 dollar value of the purchase price represented in the Deal Summary.

### *Defendants' Promissory Fraud Regarding Mr. Almimeh's Employment and Defendants' Improper Termination of Mr. Almimeh "for Cause"*

84.     As part of the Closing, Mr. Almimeh and AJA Pack Holdings executed an employment agreement, pursuant to which AJA Pack hired Mr. Almimeh as "Vice Chairman and manager of the PupCulture brand and operations" and agreed to pay Mr. Almimeh $125,000 per year in salary for three years, and pursuant to which AJA Pack Holdings and Mr. Almimeh entered into a separate Stock Option Notice and Agreement providing for the grant of an additional 140,192 stock options over a four-year vesting schedule.

85.     When Defendants executed the employment agreement, they secretly intended that Ms. Almimeh would never hold the role of "Vice Chairman and manager of the PupCulture brand and operations."

86.     When Defendants executed the employment agreement, Defendants secretly intended that they would shut Mr. Almimeh out of the operations of PupCulture and AJA Pack Holdings, and they concealed their secret intention from Mr. Almimeh and Plaintiffs.

16

87.　Around September and October 2024, Defendants began to communicate far less with Mr. Almimeh and took no steps to transition Mr. Almimeh into his new role as Vice Chairman and manager of the PupCulture brand and operations.

88.　In November 2024, shortly after the closing of the asset purchase, Defendants vacated their office at 1 Liberty Plaza to a new office, without informing Mr. Almimeh of the move, despite his new role as Vice Chairman and manager of the PupCulture brand and operations.  Defendants at the same time disabled Mr. Almimeh's email abe@pellasolutions.com.  Mr. Almimeh asked Mr. Klein why his email had been deactivated, and Mr. Klein responded that it was a mistake and that AJA Pack Holdings would re-activate the email address, but this was never done.

89.　On January 30, 2026, AJA Pack Holdings summarily terminated Mr. Almimeh's employment with AJA Pack Holdings.

90.　AJA Pack Holdings characterized the termination as "for Cause", but provided no factual support for that characterization, despite Mr. Almimeh's request for an explanation.

91.　Mr. Almimeh's employment agreement states that "Cause" means

"as determined by the Company in its discretion Employee's: (i) failure to perform his job duties or comply with the directives of the Company; (ii) dishonesty, illegal conduct, or misconduct that, in each case, is injurious to the Company or that threatens to be injurious to the Company or its affiliated persons or entities; (iii) conviction of or plea of nolo contendere or similar to any felony or crime that constitutes a misdemeanor involving dishonesty or moral turpitude; (iv) embezzlement, theft, or fraud, whether or not related to the Employee's employment with the Company; (v) material violation of any of the Company's employment or compliance policies, including the Employee's unauthorized disclosure of any Confidential or Proprietary Information, or other act that, in the Company's determination, causes or threatens to cause business, financial or reputational harm to the Company or any of its affiliated persons or entities; or (vi) material breach of this Agreement or any other agreement the Employee enters into with the Company or its affiliated persons or entities."

92.　The Option Grant Notice and Agreement for the 981,344 stock options as well as the Option Grant Notice and Agreement for the 140,192 stock options over a four-year vesting

17

schedule provide that upon termination of employment "for Cause", "any outstanding Option shall thereupon be forfeited without payment of consideration therefore."

93.     Mr. Almimeh has not breached any provision of his employment agreement with AJA Pack Holdings or engaged in any conduct that would satisfy any of the elements of a "for Cause" termination.

94.     Defendants have not identified any such conduct despite Mr. Almimeh's request.

95.     Defendants by their characterization of the January 2026 termination as "for Cause" have deprived Mr. Almimeh of what little value was contained in the options he was granted.  Defendants' unjustified termination also deprived Mr. Almimeh and his wife and two daughters of the health insurance coverage that came with his employment.

96.     Defendants used the "for Cause" termination in an attempt to intimidate Mr. Almimeh from pursuing his fraud claims regarding the stock options.

97.     As a result of Defendants' conduct described above, Plaintiffs have been damaged in an amount no less than $2.4 million, exclusive of interest, costs and attorney fees.

## FIRST CAUSE OF ACTION

## (Violation of Securities Exchange Act § 10(b) and Rule 10b-5)

## (Against all Defendants)

98.     Plaintiffs re-state all the foregoing allegations as if fully set forth herein.

99.     By virtue of Defendants' conduct alleged above, each of the Defendants, directly or indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly employed devices, schemes or artifices to defraud, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstance

18

under which they were made, not misleading, and engaged in acts, practices and courses of business which operate as fraud or deceit.

100.   By virtue of Defendants' conduct alleged above, Defendants violated Section 10b of the Securities Exchange Act (15 U.S.C § 78j) and Rule 10b-5(a)-(c) (17 C.F.R. § 240.10b-5).

101.   As alleged above, Defendants made false representations of material fact by overstating to Plaintiffs by approximately $2.1 million the value of the 981,344 stock options granted pursuant to the APA and by overstating by approximately $300,000 the value of the 140,192 options offered as part of the Employment Agreement.

102.   As also alleged above, Defendants made false representations of material fact by misrepresenting to Plaintiffs that exercise of the 981,344 stock options would not require out of pocket payment of any exercise price.

103.   Defendants knew these representations were false when made, and Defendants intended that Plaintiffs rely on these statements in selling the assets of the PupCulture business on the terms and for the price received and in accepting the stock options as consideration for that sale.

104.   Plaintiffs justifiably relied on Defendants' false representations in entering into the APA and accepting stock options as consideration therefor.

105.   Had Defendants' not made these misrepresentations about the value of the stock options and had they not induced the asset purchase with those misrepresentations, Plaintiffs would have demanded additional consideration so that the purchase price was commensurate with the $5,805,500 dollar value of the purchase price represented in the Deal Summary, or Plaintiffs simply would not have closed on the asset purchase.

106.   Defendants' conduct proximately caused damages to Plaintiffs in connection with Defendants' issuing 981,344 options in consideration for the asset purchase purchase of

Defendants' PupCulture business assets and in connection with those options that vested of the 140,192 offered as part of the Employment Agreement.

107. As a result of Defendants' violation of the Securities Exchange Act and its implementing regulations, Plaintiffs were damaged by Defendants' fraudulent inducement in an amount to be determined at trial but no less no less than $2.4 million.

## SECOND CAUSE OF ACTION

### (Fraudulent Inducement)

### (Against all Defendants)

108. Plaintiffs re-state the foregoing allegations as if fully set forth herein.

109. As alleged above, Defendants made false representations of material fact by overstating to Plaintiffs by $2.1 million the value of the 981,344 stock options granted pursuant to the APA and by overstating by $300,000 the value of the 140,192 options offered as part of the Employment Agreement.

110. As also alleged above, Defendants made false representations of material fact by misrepresenting to Plaintiffs that exercise of the 981,344 stock options would not require out of pocket payment of any exercise price.

111. Defendants knew these representations were false when made, and Defendants intended that Plaintiffs rely on these statements in selling the assets of the PupCulture business and in accepting the stock options as consideration for that sale at a value far lower than Defendants represented.

112. Defendants made further false representations of material fact by misrepresenting to Plaintiffs that at the time they executed the APA and the employment agreement, Defendants intended to employ Mr. Almimeh for three years as Vice Chairman and manager of the PupCulture brand and operations.

20

113.    Plaintiffs justifiably relied on Defendants' false representations in entering into the APA and accepting stock options as consideration therefor.

114.    Had Defendants' not made these misrepresentations about the value of the stock options and had they not induced the asset purchase with those misrepresentations, Plaintiffs would have demanded additional consideration so that the purchase price was commensurate with the $5,805,500 dollar value of the purchase price represented in the Deal Summary, or Plaintiffs simply would not have closed on the asset purchase.

115.    Defendants' conduct proximately caused damages to Plaintiffs in connection with Defendants' issuing 981,344 options in consideration for the asset purchase purchase of Defendants' PupCulture business assets and in connection with those options that vested of the 140,192 offered as part of the Employment Agreement.

116.    Plaintiffs were damaged by Defendants' fraudulent inducement in an amount to be determined at trial but no less no less than $2.4 million.

117.    In the alternative to monetary damages, Plaintiffs seek rescission of the APA.

## THIRD CAUSE OF ACTION

### (Aiding and Abetting Fraudulent Inducement)

### (Against Defendants Klein and Marx)

118.    Plaintiffs re-state the allegations in all the foregoing paragraphs as if fully set forth herein.

119.    Each of Defendants Klein and Marx aided and abetted the other's as well as AJA Pack Holdings' fraudulent inducement of Plaintiff to enter into the APA while accepting a purchase price of far lower value than had been represented.

120. Each of Defendants Klein and Marx were aware that the other as well as AJA Pack Holdings had misrepresented the value of the stock option component of the purchase price for the asset purchase.

121. Each of Defendants Klein and Marx were aware that the other as well as AJA Pack Holdings had misrepresented Defendants purported intent to employ Mr. Almimeh for three years as Vice Chairman and manager of the PupCulture brand and operations, when, in fact, Defendants secretly intended to shut Mr. Almimeh out of the PupCulture business and terminate his employment early.

122. Each of Defendants Klein and Marx provided substantial assistance to the other and to AJA Pack Holdings in fraudulently inducing Plaintiffs to sell the PupCulture assets for purchase consideration with a lower value than Defendants had represented and based on false representations about Defendants' intent for Mr. Almimeh's employment.

123. Plaintiffs reasonably relied on Defendants' misrepresentations, and were thereby damaged by no less than $2.4 million.

## FOURTH CAUSE OF ACTION

### (Breach of Contract)

### (Against AJA Pack Holdings Inc.)

124. Plaintiffs re-state the allegations in paragraph 1 – 97 as if fully set forth herein.

125. In the alternative, Plaintiffs allege that Defendant AJA Pack Holdings Inc. breached the Stock Option Grant Notice and Agreement with respect to the 981,344 options granted as part of the purchase price for the PupCulture assets.

126. The Option Grant Notice and Agreement stated, among other provisions, that the "Vesting Commencement Date" was July 15, 2024, and stated that "All Restricted Stock shall automatically deemed to be vested on the Vesting Commencement Date."

127. The Option Grant Notice and Agreement also stated, among other provisions, that "Payment of the Exercise Price shall be by any of the following, or a combination thereof: … such other form of consideration and/or pursuant to such method as the Committee shall determine in its sole and absolute discretion, provided that such form of consideration and/or method is permitted by Section 5(b)(v) of the Plan and by applicable law."

128. Thus, pursuant to the plain language of the Option Grant Notice and Agreement, and consistent with Defendants Klein and Marx's oral representations that Mr. Almimeh would not be required to pay out of pocket to exercise the options, the Grant Notice and Agreement reflected Plaintiffs' and AJA Pack Holdings' understanding that Mr. Almimeh was not required to pay the exercise price out of pocket in order to convert the options into stock.

129. Despite the Option Grant Notice and Agreement's provision and the parties mutual understanding that Mr. Almimeh would not be required to pay out of pocket to exercise the options, AJA Pack Holdings breached this provision by refusing to convert 1,000 of Mr. Almimeh's options into stock unless Mr. Almimeh paid $2.14 per option/share.

130. Defendants breached the Option Grant Notice and Agreement as to the entirety of the 981,344 stock options by anticipatory repudiation.

131. Plaintiff performed all their obligations under the Stock Option Grant Notice and Agreement as to the 981,344 options.

132. As a result of AJA Pack Holdings' breach of the Stock Option Grant Notice and Agreement, Plaintiffs have been damaged in an amount to be determined at the trial of this action.

<strong>FIFTH CAUSE OF ACTION</strong>

(<strong>Lack of Mutual Assent</strong>)

(<strong>Against AJA Pack Holdings Inc.</strong>)

23

133.    Plaintiffs re-state the allegations in paragraph 1 – 97 as if fully set forth herein.

134.    In the alternative, the language of the Stock Option Grant Notice and Agreement regarding how to exercise the 981,344 options is susceptible to at least two different interpretations: one interpretation pursuant to which Plaintiffs need not pay any exercise price out of pocket in order to convert the options into stock in AJA Pack Holdings; and one interpretation pursuant to which Plaintiffs are required to pay an exercise price out of pocket in order to convert the options into stock in AJA Pack Holdings.

135.    There was thus no meeting of the minds regarding a material element of the Asset Purchase Agreement.

136.    The Asset Purchase Agreement is therefore unenforceable and must be rescinded or deemed void ab initio.

## SIXTH CAUSE OF ACTION

### (Unjust Enrichment)

### (Against AJA Pack Holdings Inc.)

137.    Plaintiffs re-state the allegations in paragraph 1 – 97 as if fully set forth herein.

138.    In the alternative, in light of the facts alleged herein, AJA Pack Holdings has been unjustly enriched at the expense of Plaintiffs.

139.    It is against equity and good conscience to permit AJA Pack Holdings to retain all the PupCulture assets transferred by Plaintiffs to AJA Pack Holdings without additional compensation to Plaintiffs from AJA Pack Holdings.

140.    Plaintiffs thus have been damaged in an amount to be determined at trial but no less than $2.4 million.

## SEVENTH CAUSE OF ACTION

### (Breach of the Covenant of Good Faith and Fair Dealing)

24

**(Against AJA Pack Holdings Inc.)**

141.    Plaintiffs re-state the allegations in paragraphs 1 – 97 as if fully set forth herein.

142.    While the Employment Agreement granted AJA Pack Holdings discretion to determine whether termination of Mr. Almimeh's employment was "for Cause," the law of the State of New York prohibits Defendants from exercising that discretion in bad faith to deprive Mr. Almimeh of the fruits of the bargain or to intimidate him, as Defendants have done here.

143.    By purporting to terminate Mr. Almimeh's employment "for Cause" Defendants have exercised their discretion under the Employment Agreement in bad faith, and have thereby breached the covenant of good faith and fair dealing.

144.    As a result of said breach, Defendants have caused damages to Plaintiffs in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs pray that this Court enter judgment in favor of Plaintiffs and against Defendants as follows:

A.  On the First Cause of Action for Violation of Securities Exchange Act § 10b and Rule 10b-5, for general damages and punitive damages in in Plaintiffs' favor in an amount to be determined at trial but no less than $2.1 million, plus prejudgment interest, costs of suit, and attorney's fees;

B.  On the Second Cause of Action for Fraudulent Inducement, for general damages and punitive damages in in Plaintiffs' favor in an amount to be determined at trial but no less than $2.1 million, plus prejudgment interest, costs of suit, and attorney's fees;

C.  On the Third Cause of Action for Aiding and Abetting Fraudulent Inducement, for general damages and punitive damages in Plaintiffs' favor in an amount to be determined at trial, plus prejudgment interest, costs of suit, and attorney's fees;

D.  On the Fourth Cause of Action for Breach of Contract, for general damages in Plaintiffs' favor in an amount to be determined at trial, plus prejudgment interest, costs of suit, and attorney's fees;

E.  On the Fifth Cause of Action for Lack of Mutual Assent, for rescission;

F.  On the Sixth Cause of Action for Unjust Enrichment, for general damages in an amount to be determined at trial, plus prejudgment interest, costs of suit, and attorney's fees;

G.  On the Seventh Cause of Action for Breach of the Covenant of Good Faith and Fair Dealing, for general damages and punitive damages in Plaintiffs' favor in an amount to be determined at trial, plus prejudgment interest, costs of suit, and attorney's fees;

H.  For such other and further relief as is deemed just and proper.


**JURY DEMAND**

Plaintiffs hereby demand a jury trial on all causes of action so triable.


Dated: New York, New York
July 13, 2026                                    HEERDE LAW PLLC

                                                /s/  Matthew C. Heerde
                                                By: Matthew C. Heerde
                                                48 Wall Street 26th Floor
                                                New York, NY 10005
                                                Tel: 347-460-3588
                                                Fax: 347-535-3588
                                                Email: mheerde@heerdelaw.com
                                                *Attorneys for Plaintiffs*


26