HEERDE LAW PLLC
Matthew C. Heerde
48 Wall Street 31st Floor
New York, NY 10005
E: mheerde@heerdelaw.com
P: 347-460-3588
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IBRAHIM ALMIMEH, PUPCULTURE LLC, PUPCULTURE DUMBO LLC, PUPCULTURE FIDI LLC, PUPCULTURE TRIBECA LLC, PUPCULTURE UWS LLC,<br><br>*Plaintiffs,*<br><br>vs.<br><br>AJA PACK HOLDINGS INC. f/k/a PELLA SOLUTIONS INC., JOSHUA MARX, and ALEX KLEIN,<br><br>*Defendants*. | **1:26-cv-05919-JSR** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

STANDARD OF DECISION ........ 2

APPLICABILITY OF FEDERAL LAW, NEW YORK LAW, AND DELAWARE LAW TO PLAINTIFFS' CLAIMS ........ 3

ARGUMENT ........ 4

I. THE GOVERNING AGREEMENTS DO NOT PRECLUDE PLAINTIFFS' CLAIMS ........ 4

A. The Governing Agreements Do Not Address the Stock Options' Monetary Value. ........ 4

B. The Governing Agreements are Consistent With Defendants' Alleged Representations That Almimeh Would Not Have to Pay Out of Pocket to Exercise the Options. ........ 5

1. The Purchase Options Agreement § H(3) Clearly States the Exercise Price can be Paid With Consideration Other Than Money. ........ 5

2. The Purchase Options Agreement's Language Regarding "EXERCISE SCHEDULE" is Consistent With an Understanding That the Options Would Convert to Stock on July 15, 2024 ........ 6

C. The Governing Agreements' Boilerplate Disclaimers do not Preclude Reliance on Defendants' Alleged Representations. ........ 7

II. THE COMPLAINT SUFFICIENTLY ALLEGES ITS FIRST CAUSE OF ACTION FOR VIOLATION OF § 10(b) AND RULE 10b-5. ........ 8

A. The Complaint Sets Out Sufficiently Specific Allegations as to Defendants' Misrepresentations. ........ 10

B. Plaintiff Almimeh is not a Sophisticated Businessperson and his Reliance on Defendants' Representations is Reasonable as Alleged. ........ 12

III. THE COMPLAINT SUFFICIENTLY ALLEGES ITS SECOND CAUSE OF ACTION FOR COMMON LAW FRAUDULENT INDUCEMENT. ........ 14

A. The Analysis of Plaintiffs' Claims for Fraudulent Inducement Arising From Misrepresentations as to the Options' Monetary Value and Method of Exercise is the Same as the Analysis of Plaintiffs' Securities Fraud Claims. ........ 14

B. Almimeh Adequately Pleads his Claim for Fraudulent Inducement as to Defendants' Secret Intent to Not Perform Their Promise That Almimeh Would Serve for Three Years as Vice Chairman and Manager of PupCulture Operations. ........ 14

IV. THE COMPLAINT SUFFICIENTLY ALLEGES ITS THIRD CAUSE OF ACTION FOR AIDING AND ABETTING FRAUD. ........ 17

V. THE COMPLAINT SUFFICIENTLY ALLEGES ITS FOURTH CAUSE OF ACTION FOR BREACH OF CONTRACT ........ 19

VI. THE COMPLAINT SUFFICIENTLY ALLEGES ITS FIFTH CAUSE OF ACTION FOR RESCISSION BASED ON LACK OF MUTUAL ASSENT. ........ 21

VII. THE COMPLAINT SUFFICIENTLY ALLEGES ITS SIXTH CAUSE OF ACTION FOR UNJUST ENRICHMENT ........ 23

VIII. THE COMPLAINT SUFFICIENTLY ALLEGES ITS SEVENTH CAUSE OF ACTION FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING. ........ 24

CONCLUSION ........ 27

# TABLE OF AUTHORITIES

## Cases

*Abry Partners V, L.P. v. F & W Acquisition LLC*
891 A2d 1032 (Del Ch 2006) ....................7

*ACA Fin. Guar. Corp. v Goldman, Sachs & Co.*
25 NY3d 1043 (2015)....................13

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*
493 F3d 87 (2d Cir 2007) ....................9

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*
448 F.3d 573 (2d Cir. 2006) ....................23

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*
70 N.Y.2d 382 (1987)....................23

*Corsello v. Verizon New York, Inc.*
18 N.Y.3d 777 (2012)....................24

*D'Artagnan, LLC v. Sprinklr Inc.*
192 A.D.3d 475 (1st Dep't 2021) ....................22

*Danann Realty Corp. v Harris*
5 NY2d 317 (1959)....................8

*Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.*
68 N.Y.2d 954 (1986)....................15

*Dexia SA/NV v. Bear, Stearns & Co., Inc.*
929 F Supp 2d 231 (SDNY 2013) ....................13

*Dodona I, LLC v Goldman, Sachs & Co.*
847 F Supp 2d 624 (SDNY 2012) ....................12

*FIH, LLC v. Found. Capital Partners LLC*
920 F3d 134 (2d Cir 2019) ....................8

*Fortis Advisors LLC v. Medtronic Minimed, Inc.*
2023-1055-MAA, 2024 WL 3580827 (Del Ch July 29, 2024) ....................19

*Gessin Elec. Contractors, Inc. v. 95 Wall Associates, LLC*
74 A.D.3d 516 (1st Dep't 2010) ....................22

*In re AES Corp. Sec. Litig.*
849 F Supp 907 (SDNY 1994) ....................13

*In re Magnum Hunter Resources Corp. Sec. Litig.*
26 F Supp 3d 278 (SDNY 2014) ....................9

*Krock v. Lipsay*
97 F.3d 640 (2d Cir. 1996) ....................3

*Lentell v. Merrill Lynch & Co., Inc.*
396 F3d 161 (2d Cir 2005) ....................9

*LGM Holdings, LLC v. Schurder*
340 A.3d 1134 (Del. 2025)....................20

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*
797 F.3d 160 (2d Cir. 2015) ....................3

*Manufacturers Hanover Tr. Co. v Yanakas*
7 F3d 310 (2d Cir 1993) ....................8

*Mayaguez S.A. v Citigroup, Inc.*
16 CIV. 6788 (PGG), 2018 WL 1587597 (SDNY Mar. 28, 2018) ....................3

*Robinson v Deutsche Bank Tr. Co. Americas*
572 F Supp 2d 319 (SDNY 2008) ....................4

*Sabo v. Delman*
3 N.Y.2d 155, 160 (1957)....................15

*Sawabeh Info. Services Co. v Brody*
832 F Supp 2d 280 (SDNY 2011) ....................14

*Sheehan v AssuredPartners, Inc.*
CV 2019-0333-AML, 2020 WL 2838575 (Del Ch May 29, 2020) ....................25

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*
346 F. Supp. 3d 473 (SDNY 2018) ....................17

*Simkin v. Blank*
19 N.Y.3d 46 (2012)....................23

*Smith v Scott*
CV 2020-0263-JRS, 2021 WL 1592463 (Del Ch Apr. 23, 2021)....................25

*Stewart v. Jackson & Nash*
976 F.2d 86, 88–90 (2d Cir. 1992) ....................16

*Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*
206 A.3d 836 (Del. 2019)....................20

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*
551 U.S. 308 (2007) ....................................................................................................9

*Waste Connections of New York, Inc. v Century Waste Services, LLC*
25 CV 3040 (VM), 2025 WL 3141742 (SDNY Nov. 10, 2025)...............................................3

*Wu v. Uber Technologies, Inc.*
43 N.Y.3d 288 (2024)..................................................................................................21

**Statutes**

15 U.S.C. § 78u–4(b)(2) ..............................................................................................10

**Rules**

Fed. R. Civ. P. 9(b).......................................................................................................10

## INTRODUCTION

Defendants' Motion to Dismiss (the "**Motion**") relies principally on mischaracterization of the Complaint and misapplication of governing law. Defendants' presumption that this Court will readily adopt their mis-telling of the allegations and the law, indeed, echoes the arrogance of Defendants' conduct alleged in this action, which was to—before the July 15, 2024 closing—clearly and repeatedly describe the terms of the deal one way, and then—after closing—maintain the deal was something quite different from what they had repeatedly described, while using a set of vague and confusing documents to support their scheme. The Motion fails to negate Plaintiffs' claims based in fraud, contract and equity and the Motion must be denied.

On its face, Plaintiffs' Complaint clearly pleads its causes of action for fraud with sufficient detail and specificity. Defendants cannot at this stage establish that Plaintiffs did not reasonably rely on the alleged fraudulent misrepresentations. Plaintiffs greatly exaggerate the effect of the contract's terms and boilerplate disclaimers, none of which shield Defendants from Plaintiffs' particularized allegations of Defendants' knowing misrepresentations. Plaintiffs' alternative claims based in contract and equity are consistent with the governing documents and the facts pleaded. And Plaintiffs are quite incorrect about how the covenant of good faith and fair dealing works under Delaware law.

Defendants by their Motion essentially ask this Court to turn a blind eye to their deceit and forego investigation of their purported "for Cause" termination, which Defendants now hide behind to argue their wrongdoing is moot and beyond the Court's reach. Defendants ask the Court to simply accept that Almimeh and the PupCulture entities entered into the asset purchase deal and agreed that, rather than *receive* purchase stock options with the $2.1 million monetary value Defendants repeatedly described, Plaintiffs *would themselves pay $2.1 million to*

*Defendants*, rendering the net value of the consideration paid to Plaintiffs barely north of $1 million. The Court should reject Defendants tidy little scheme.

As discussed below, dismissal would be improper on the record before the Court, and the Motion should be denied.

## **STANDARD OF DECISION**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"The assessment of whether a complaint's factual allegations plausibly give rise to an entitlement to relief 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal' conduct." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (quoting *Twombly*, 550 U.S. at 556); see *Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

In determining whether a complaint states a claim that is plausible, courts must "give no effect to assertions of law or to legal conclusions couched as factual allegations but [must] accept as true the factual allegations of the complaint and construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (cleaned up); see *Iqbal*, 556 U.S. at 678. In considering a Rule 12(b)(6) motion, a district court may also consider "documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *Doe v. N.Y. University*, No. 20-CV-1343, 2021 WL 1226384, at *10 (S.D.N.Y. Mar. 31, 2021) (citation omitted).

As to claims sounding in fraud, the element of reasonable reliance is not easily susceptible to a motion to dismiss. "In general, the reasonableness of a plaintiff's reliance is a nettlesome and fact-intensive question which courts will not lightly dispose of at the motion-to-dismiss stage." *Waste Connections of New York, Inc. v Century Waste Services, LLC*, 25 CV 3040 (VM), 2025 WL 3141742, at *8 (SDNY Nov. 10, 2025) (citing *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 186 n.19 [2d Cir. 2015]).

## APPLICABILITY OF FEDERAL LAW, NEW YORK LAW, AND DELAWARE LAW TO PLAINTIFFS' CLAIMS

The March 27, 2024 Asset Purchase Agreement ("**APA**" [Zareh Dec. Exh. 1 Doc 17-4]) states at § 10.10(a) at that it is to be "governed by and construed in accordance with the internal laws of the State of New York."

The July 15, 2024 Employment Agreement ("**Employment Agreement**" [Zareh Dec. Exh. 2 Doc 17-5]) states at Section 16 that it is governed by Delaware law.

The stock option grant notice and agreement for the 981,344 options granted as consideration for the asset purchase (hereinafter, the "**Purchase Options**" and the "**Purchase Options Agreement**" [Zareh Dec. Exh. 3 Doc 17-6]) states at Section N that it is governed by Delaware law.

A provision saying that an agreement is "governed by" a chosen state's law does not necessarily extend to a fraud claim arising incident to the agreement. *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996). "New York does not read a choice of law provision that appears, by its terms, to address only the governing law for purposes of interpreting the contract, to encompass tort and other non-contractual causes of action." *Mayaguez S.A. v Citigroup, Inc.*, 16 CIV. 6788 (PGG), 2018 WL 1587597, at *7 (SDNY Mar. 28, 2018).

## ARGUMENT

### I. THE GOVERNING AGREEMENTS DO NOT PRECLUDE PLAINTIFFS' CLAIMS.

Defendants' Motion relies heavily on the argument that Plaintiffs' claims are contradicted and thus barred by the terms of the APA, the Purchase Options Agreement, and the Employment Agreement. But Defendants far exaggerate the scope, clarity and preclusive effect of the governing agreements' provisions. This issue bears on the first five causes of action, and Plaintiffs therefore address it here as an initial matter.

#### A. The Governing Agreements Do Not Address the Stock Options' Monetary Value.

As alleged at Complaint ¶ 55, neither the APA nor the Purchase Options Agreement address at any point the monetary value of the 981,344 Purchase Stock Options or the stock underlying those options. There was (and is) no way to determine the actual value of these stock options from the face of the governing agreements, and Defendants do not contend otherwise.

As alleged in the Complaint, the only representations made by Defendants before closing about the monetary value of the Purchase Stock Options were made in Alex Klein's March 16, 2024 text message, ¶ 40, the March 22, 2024 Deal Summary, ¶¶ 42 – 53, and in Klein's and Marx's numerous oral representations in the months between the March 27, 2024 APA and the July 15, 2024 closing. ¶¶ 56, 57, 60.

Therefore, the governing agreements do not on their face contradict the alleged misrepresentations regarding the stock options' monetary value and do not preclude Plaintiffs' reasonable reliance on those misrepresentations. *See Robinson v Deutsche Bank Tr. Co. Americas*, 572 F Supp 2d 319, 323 (SDNY 2008) ("courts in this district have declined to find reliance unreasonable as a matter of law where there is no contradiction between the agreement and the representation").

### B. The Governing Agreements are Consistent With Defendants' Alleged Representations That Almimeh Would Not Have to Pay Out of Pocket to Exercise the Options.

The APA itself makes no representations regarding the mechanism or consideration for exercising the Purchase Stock Options, and Defendants do not contend otherwise. It is the Purchase Options Agreement that describes how the Purchase Options are exercised, and, for the following reasons, the Purchase Options Agreement is susceptible to Defendants' alleged representations that Almimeh would not have to pay out of pocket to exercise the options and obtain stock in AJA Pack:

#### *1. The Purchase Options Agreement § H(3) Clearly States the Exercise Price can be Paid With Consideration Other Than Money.*

The Purchase Options Agreement at § H states:

"Payment of the aggregate Exercise Price shall be by any of the following, or a combination thereof:

1. cash;

2. certified or bank check; or

3. such other form of consideration and/or pursuant to such method as the Committee shall determine in its sole and absolute discretion, provided that such form of consideration and/or method is permitted by Section 5(b)(v) of the Plan and by applicable law." Zareh Dec. Ex 3 (Doc 17-6) p. 5 § H.

Defendants apparently argue that the Purchase Options Agreement's identification of the $2.14 exercise price means that Almimeh was required to pay money out of pocket to exercise. Defs. MOL pp. 12 of 31; 16 of 31; 21 of 31. But this argument is squarely refuted by the plain language of Purchase Options Agreement § H(3), which explicitly authorizes non-money

payment to exercise. Defendants do not even attempt to reconcile their lame argument with § H(3), because they cannot.

The Purchase Options Agreement is very clear on its face that consideration other than money—such as the PupCulture business assets tendered by Plaintiffs—could be an acceptable form of payment to exercise the Purchase Options.

#### *2. The Purchase Options Agreement's Language Regarding "EXERCISE SCHEDULE" is Consistent With an Understanding That the Options Would Convert to Stock on July 15, 2024.*

The first page of the Purchase Options Agreement sets out in bold capital letters a list of eight characteristics of the Purchase Options ("OPTIONEE," "DATE OF GRANT," "VESTING COMMENCEMENT DATE," etc.). The very last item is "EXERCISE SCHEDULE," which is followed by the language "All Restricted Stock shall automatically be deemed to be vested upon the Vesting Commencement Date." Zareh Dec. Ex 3 (Doc 17-6) p. 1 of 10. The Purchase Options Agreement reiterates this "EXERCISE SCHEDULE" on page 3, where it states: "A. EXERCISE SCHEDULE. As Set forth in the Grant Notice." Zareh Dec. Ex 3 (Doc 17-6) p. 3 of 10 § A. This language is consistent with an understanding that the Purchase Options would be automatically converted to stock without Almimeh paying money out of pocket.

Defendants contend that the language following "EXERCISE SCHEDULE" on page 1 of the Purchase Options Agreement does not refer to the 981,344 options that are the subject of the Purchase Options Agreement, but somehow refers to other unidentified "restricted stock that vests automatically with no purchase obligation." Defs' MOL p. 13 of 31. Defendants do not explain why, in their telling, the Purchase Option Agreement would dedicate critical terms on its first page to a purported security that played zero role in this transaction and appears nowhere else in the governing agreements, and Defendants' position strains common sense. It is a

reasonable interpretation, if not the exclusively available interpretation, that this language refers to the Purchase Options and speaks to the stock underlying the Purchase Options.

Therefore, in light of the Purchase Options Agreement § H(3)'s provision that the exercise price for the 981,344 Purchase Options could be paid by means other than cash, and in light of the fact the "EXERCISE SCHEDULE" language at page 1 of the Purchase Option Agreement could be understood to explain that underlying stock the options is deemed vested upon the July 15, 2024 Vesting Commencement Date, the Purchase Options Agreement *does not contradict* Defendants' alleged misrepresentations that Almimeh would not have to pay cash to exercise the Purchase Options. Indeed, Defendants' themselves explain that the "EXERCISE SCHEDULE" language is consistent with an understanding that the subject securities have "no purchase obligation." Defs.' MOL p. 13 of 31.

### C. The Governing Agreements' Boilerplate Disclaimers do not Preclude Reliance on Defendants' Alleged Representations.

Defendants argue that language in the Purchase Options Agreement stating Almimeh reviewed and understood the Agreement forecloses Almimeh's allegations that Defendants represented the options could be exercised without paying money. Defs.' MOL pp. 12 of 31; 16 of 31. Defendants further argue that APA's integration clause at Section 10.06 also forecloses Plaintiffs' claims for securities fraud and fraudulent inducement. Defs. MOL p. 25 of 31, fn. 5.

Defendants' arguments fail. Under Delaware law, New York law, and federal law, the generalized language cited by Defendants does not insulate them from their extra-contractual misrepresentations—only a specific non-reliance clause could do that.

*See Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A2d 1032, 1059 (Del Ch 2006) ("murky integration clauses, or standard integration clauses without explicit anti-reliance representations, will not relieve a party of its oral and extra-contractual fraudulent

representations. The integration clause must contain language that can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract.”).

*See Manufacturers Hanover Tr. Co. v Yanakas,* 7 F3d 310, 315 (2d Cir 1993) (reversing dismissal of fraudulent inducement claims, and stating “a general merger clause is ineffective, however, to preclude parol evidence that a party was induced to enter the contract by means of fraud.” … “Where the fraud claim has been dismissed, the disclaimer has been sufficiently specific to match the alleged fraud.”); *Danann Realty Corp. v Harris,* 5 NY2d 317, 320 (1959) (“a general merger clause is ineffective to exclude parol evidence to show fraud in inducing the contract”)

*See also FIH, LLC v. Found. Capital Partners LLC*, 920 F3d 134, 141 (2d Cir 2019) (holding that general merger clause did not preclude reasonable reliance in claim under §10(b) of the Securities Exchange Act, and stating “[s]tanding alone, therefore, a general disclaimer (still less a general merger clause) is not sufficient as a matter of law to preclude reasonable reliance on material factual misrepresentations, even by a sophisticated investor”).

Here, neither the disclaimer in Purchase Options Agreement nor the integration clause in § 10.06 of the APA are sufficiently specific to foreclose Plaintiffs’ allegations of fraud regarding the monetary value of the options or the method of exercise of the options.

## II. THE COMPLAINT SUFFICIENTLY ALLEGES ITS FIRST CAUSE OF ACTION FOR VIOLATION OF § 10(b) AND RULE 10b-5.

In addition to relying on the general disclaimer provisions—which do not prevail—Defendants make two principal arguments in support of their Motion to dismiss Plaintiffs’ cause of action for securities fraud: that that the Complaint’s allegations of fraud are insufficiently specific, and that Plaintiff Almimeh is a sophisticated businessman who undertook insufficient

investigation into Defendants' alleged misrepresentations before closing the deal. As discussed below, these arguments fail to justify dismissal.

To state a cause of action under Section 10(b) or Rule 10b–5, plaintiffs must set forth sufficient plausible allegations that defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *In re Magnum Hunter Resources Corp. Sec. Litig*., 26 F Supp 3d 278, 289 (SDNY 2014); *Lentell v. Merrill Lynch & Co., Inc*., 396 F3d 161, 172 (2d Cir 2005).

Securities fraud claims plaintiffs must satisfy Rule 9(b), which requires they "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The Private Securities Litigation Reform Act ("PSLRA") further requires a securities complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F3d 87, 99 (2d Cir 2007).

The "scienter" element may be pleaded by alleging facts giving rise to a strong inference that the defendant acted with the required state of mind. *Tellabs, Inc. v. Makor Issues & Rts., Ltd*., 551 U.S. 308 (2007) *citing* 15 U.S.C. § 78u–4(b)(2). In analyzing this element of the pleading, the Court must accept all factual allegations as true; must consider the complaint in its entirety, assessing whether all facts alleged, taken collectively, give rise to a strong inference of scienter; and must take into account plausible opposing inferences. *Tellabs, Inc.*, 551 U.S. at 322 – 323.

Moreover, the inquiry as to scienter at this stage is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551

US 308, 323 (2007). Further, "the inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences." *Id*. at 324.

As discussed below, the Complaint satisfies all these standards.

### A. The Complaint Sets Out Sufficiently Specific Allegations as to Defendants' Misrepresentations.

In compliance with the PSLRA, the Complaint specifies the statements that Plaintiffs contend were fraudulent. The Complaint identifies at least the following fraudulent statements: that the 981,344 Purchase Options had a monetary value of $2.1 million (¶¶ 9, 46, 47, 48); and that Almimeh would not have to pay out of pocket to convert his options into stock in AJA Pack (¶¶ 10, 39, 57, 58, 59, 60, 82). Those paragraphs identify each of defendants Alex Klein and Joshua Marx as the speakers as applicable. The paragraphs specify where and when the statements were made: during at least eight meetings in the Beekman Hotel in Manhattan's Financial District in April, May, June 2024 (¶ 57), at meetings at AJA Pack's office (¶¶ 58, 59), in a text message from Alex Klein (¶ 40), and in the written March 27, 2024 Deal Summary, first shown to Plaintiffs on March 22, 2024 at the Beekman Hotel. ¶ 42.

The Complaint explains why the alleged statements were fraudulent. The Complaint alleges that Defendants statements regarding the monetary value of the Options were false, because Defendants ultimately, contrary to their representations, required Plaintiff to pay out of pocket for options whose per-option exercise price was at or near the per-share value in AJA Pack. ¶¶ 51, 52, 56, 57, 81, 82, 101. The Complaint alleges that Defendants statements that Almimeh would not have to pay out of pocket to exercise the options were false, for much the same reason. ¶¶ 56, 57, 58, 80, 81, 82, 102. The Complaint explains that Defendants made these misrepresentations "to conceal the true value of the stock options that Defendants were offering

as consideration for the asset purchase, in order to induce Mr. Almimeh into accepting purchase consideration of far lower value than the value of the PupCulture assets, and in order to give Mr. Almimeh the false understanding that he need not pay out of pocket in order to convert his options into common stock in AJA Pack Holdings." ¶ 53; *see also* ¶ 63.

The Complaint sufficiently alleges that the Defendants knew their representations about the value of the Options and the method of exercise were false, ¶¶ 51, 52, 103, particularly in light of the fact that after closing, Defendants refused to honor their representations that Almimeh would not have to pay out of pocket to exercise, and sought to make Almimeh pay Defendants to obtain the stock they had been telling him he would own as of the closing. ¶¶ 58, 59, 60, 63, 81, 82.

Defendants' Motion offers confusing discussion of the "fluctuating valuations of privately held companies" (p 23 of 31) to distract from the Complaint's plain thrust: Defendants over and over again falsely told Alimimeh the options they were granting him had a monetary value of $2.1 million, and they knew that value was false.

Tellingly, however, Defendants nowhere contend the Purchase Stock Options did in fact have a monetary value of $2.1 million at close (or at any point). And Defendants nowhere contend they believed the options ever had such value. Nor could they plausibly so contend, when they concede as alleged in the Complaint that Defendants around November 4, 2025 refused to permit Almimeh exercise 1,000 of his stock options without paying $2.14 per option/share—meaning that to exercise all the 981,344 options, *Almimeh would have had to pay $2.1 million to Defendants*. (Defs' MOL p. 11 of 31; Complaint ¶¶ 81, 82.)

Finally, the Complaint alleges Defendants' motive for their fraudulent statements, i.e., to obtain a discount on the PupCulture assets. ¶¶ 3, 103. The Complaint further alleges Defendants' opportunity to commit fraud by describing Defendants Klein's and Marx's repeated

meetings with Almimeh and their control over AJA Pack's decision to effectively demand that *Almimeh pay Defendants* $2.1 million to exercise the Purchase Options. ¶¶ 10, 81, 82.

Critically, the Complaint corroborates its allegations of Defendants' scienter by quoting statements Defendant Klein made to Almimeh during a meeting months after the closing, in which Klein admitted to Almimeh that Defendant Marx "lied" to Almimeh about the terms of the deal. ¶¶ 75, 76.

Therefore, the Complaint adequately alleges with sufficient particularity and plausible detail all the elements of securities fraud under § 10(b) and Rule 10b-5.

**B. Plaintiff Almimeh is not a Sophisticated Businessperson and his Reliance on Defendants' Representations is Reasonable as Alleged.**

Defendants blithely proclaim that Plaintiff Abe Almimeh is a "sophisticated business owner," but this assertion is off the mark, and the question of a plaintiffs' sophistication is generally not suitable for disposition on a motion to dismiss. *Dodona I, LLC v Goldman, Sachs & Co.*, 847 F Supp 2d 624, 649 (SDNY 2012) (whether [plaintiff] was sophisticated and whether it should have uncovered the alleged fraud at the time of the investment using public information are questions of fact. Thus, prior to discovery, the Court will not hazard a guess regarding Dodona's level of sophistication").

The Complaint alleges that Plaintiff Almimeh is, in fact, not sophisticated, having worked all his adult life operating PupCulture. ¶¶ 2, 15. This is in contrast to Defendants Marx and Klein, who have extensive backgrounds in finance and mergers and acquisitions and hold degrees in economics from Yale University and University of Pennsylvania, respectively. ¶ 34. Defendants' Motion to Dismiss does not succeed in characterizing Almimeh as a "sophisticated" plaintiff such that the law would impose on him an obligation to undertake higher levels of scrutiny into the elements of the securities component of the asset purchase consideration. *In re*

*AES Corp. Sec. Litig*., 849 F Supp 907, 910 (SDNY 1994) ("A sophisticated investor is held to a higher duty of inquiry, and so may not claim reliance upon misrepresentations which might dupe only the naive investor. Thus, evidence probative of the degree of sophistication of a plaintiff in a securities case is both admissible at trial ... and an apt subject for discovery.")

The question of a plaintiff's sophistication in Second Circuit §10(b) cases is highly fact-specific and context-dependent, and ill-suited for disposition on a motion to dismiss, as is the question of reasonable reliance, generally. "[T]he question of what constitutes reasonable reliance is not generally a question to be resolved as a matter of law on a motion to dismiss." *ACA Fin. Guar. Corp. v Goldman, Sachs & Co*., 25 NY3d 1043, 1045 (2015) (refusing to dismiss fraudulent inducement claim, and finding "plaintiff has sufficiently alleged justifiable reliance" where plaintiff made simple inquiry to the defendant regarding investment).

Here, in light of Almimeh's lack of sophistication, his reliance on the representations of Defendants was reasonable. This is particularly so where facts about the monetary value of the options was within Defendants' knowledge, but not Almimeh's. "[E]ven a sophisticated party may rely on the representations of another where the facts misrepresented were "peculiarly within the Defendants' knowledge.'" *Dexia SA/NV v. Bear, Stearns & Co., Inc.*, 929 F Supp 2d 231, 243 (SDNY 2013). As alleged in the Complaint, Almimeh did diligently request Defendants provide him with information about the value of the underlying stock in AJA Pack Holdings, Inc. ¶ 64.

Thus, as explained above, the Complaint pleads its claim for violation of § 10(b) of the Securities Exchange Act and Rule 10b-5 with sufficient particularity as to all the elements of the claim.

Finally, Defendants' objection to the PupCulture entities' standing is limited to the first cause of action; it does not erase the PupCulture entities' distinct injury from the allegedly

fraudulently induced transfer of their assets. If the Court determines that Almimeh alone acquired the options and all rights to acquire the shares, the securities fraud claim may proceed as to Almimeh.

## III. THE COMPLAINT SUFFICIENTLY ALLEGES ITS SECOND CAUSE OF ACTION FOR COMMON LAW FRAUDULENT INDUCEMENT.

### A. The Analysis of Plaintiffs' Claims for Fraudulent Inducement Arising From Misrepresentations as to the Options' Monetary Value and Method of Exercise is the Same as the Analysis of Plaintiffs' Securities Fraud Claims.

This Court repeatedly holds that the analysis on a motion to dismiss for fraudulent inducement under New York law is the same as the analysis for securities fraud under §10(b) and Rule 10b-5. *Sawabeh Info. Services Co. v Brody*, 832 F Supp 2d 280, 297-98 (SDNY 2011) ("the elements of fraudulent inducement are substantially the same as those for common law fraud. Because the elements of common law fraud under New York law are substantially identical to those governing Section 10(b), an identical analysis applies.").

The branch of Plaintiff's claim for fraudulent inducement based on misrepresentations regarding the options' monetary value and method of exercise is subject to the same analysis as Plaintiffs' claim for securities fraud. Because Plaintiffs' claim for Securities Fraud survives Defendants' Motion to Dismiss, so does that branch of Plaintiffs' claim for fraudulent inducement.

### B. Almimeh Adequately Pleads his Claim for Fraudulent Inducement as to Defendants' Secret Intent to Not Perform Their Promise That Almimeh Would Serve for Three Years as Vice Chairman and Manager of PupCulture Operations.

The Complaint alleges that, as part of their scheme to defraud Plaintiffs into selling the PupCulture assets for less than their fair value, Defendants falsely promised Almimeh that, as part of the asset purchase deal, AJA Pack would employ Almimeh for three years in the role of Vice Chairman and Manager of PupCulture Operations. ¶¶ 84 – 89, 112. In essence, Defendants

furthered enticed Almimeh into a deal that was not what it seemed by promising Almimeh he would retain some oversight over the business he had built over more than 20 years, but Defendants actually secretly intended to freeze Almimeh out immediately after closing. Defendants did just that, moving their office in November 2024 without informing Almimeh of the new location, ¶ 88, disabling Mr. Almimeh's AJA Pack email address, ¶ 88, and ultimately terminating Almimeh's employment entirely, ¶89, depriving him and his family of the health insurance that came with his AJA Pack employment. ¶ 95.

Defendants argue that "there are no factual allegations in support and no pleading with particularly the circumstances constituting the alleged fraud." Defs." MOL p. 27 of 31. This is simply false. Moreover, Defendants' Motion either misunderstands or deliberately mischaracterizes Almimeh's claim for fraudulent inducement with respect to his AJA Pack employment. Defendants contend "Almimeh's only support appears to be the suggestion that he was terminated 'for cause' without further explanation". This, too, is quite wrong in several ways.

As noted above, Almimeh's claim for fraud regarding his employment is that Defendants promised to employ him for three years in the role of Vice Chairman and Manager of PupCulture Operations, but Defendants when they made that promise secretly intended never to fulfill it. ¶¶ 84 – 89, 112. Rather, Defendants made the promise only to further entice Mr. Almimeh into their fraudulent asset purchase deal.

Under New York law, a promise concerning future performance is actionable as fraudulent inducement when, at the time it is made, the promisor has a preconceived, undisclosed intention not to perform. The misrepresentation is then one of present intent, not merely an unfulfilled prediction. *Sabo v. Delman*, 3 N.Y.2d 155, 160 (1957); *Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986).

The Second Circuit has applied this rule to a promised employment role: an allegation that the employer, when promising the employee a particular position, knew it did not intend to confer that position stated fraudulent inducement under New York law. *See Stewart v. Jackson & Nash*, 976 F.2d 86, 88–90 (2d Cir. 1992) (holding that when employer made promise of future employment, employer "knew that it did not intend to fulfill it", and such representation was "an allegation of present fact which gives rise to a claim of fraudulent inducement.").

Here, the Complaint pleads a concrete promise and the secret contrary intent to not perform. The March 22, 2024 Deal Summary presented Almimeh's upcoming employment—including salary, benefits, and employment-related options—as part of the transaction's stated value. Cmplnt. ¶¶ 42–50. At closing, per the Employment Agreement, AJA Pack agreed to hire Almimeh as "Vice Chairman and manager of the PupCulture brand and operations". The Complaint alleges that, when the employment agreement was executed, Defendants secretly intended not to give him that role and instead to shut him out of operations. ¶¶ 84–86, 112. These allegations identify the promise, the transaction in which it was made, and the present state of mind alleged to have been concealed. Defendants made further false representations of material fact by misrepresenting to Plaintiffs that at the time they executed the APA and the employment agreement, Defendants intended to employ Mr. Almimeh for three years as Vice Chairman and manager of the PupCulture brand and operations.

Critically, the pleaded falsity of the promise does not rely solely on the January 30, 2026 termination. The Complaint alleges that by September and October 2024, shortly after closing, Defendants had reduced communications with Almimeh and taken no steps to transition him into the promised role. It further alleges that in November 2024 they moved offices without telling him, deactivated his work email, and never restored it despite Klein's assurance that they would. Cmplnt. ¶¶ 87–88. Viewed together and in Almimeh's favor, those relatively prompt and

concrete acts of exclusion permit an inference that Defendants' contrary intent existed when they offered the role as part of the transaction.

The inference of the falsity of Defendants' promise of employment is further supported by the plausibility that Defendants only offered the position to Almimeh in aid of their scheme to lure him into a fraudulent asset purchase deal, with the intent to oust him after Defendants had gotten the assets at the discount they wanted.

Thus, Almimeh's claim for fraud with respect to his employment does not at all, as Defendants contend, rest upon whether the "for Cause" termination was proper or was explained. The significant problems with the "for Cause" termination are addressed in Almimeh's claim in the Sixth Cause of Action against AJA Pack Holdings for Breach of the Covenant of Good Faith and Fair Dealing, discussed below.

## IV. THE COMPLAINT SUFFICIENTLY ALLEGES ITS THIRD CAUSE OF ACTION FOR AIDING AND ABETTING FRAUD.

Under New York law, as applied by courts in the Second Circuit, a claim for aiding and abetting fraud requires three elements: (1) the existence of an underlying fraud; (2) the defendant's actual knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission. *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 482 (SDNY 2018). The Complaint adequately pleads all these elements.

As discussed above, the Complaint pleads the underlying fraud arising from Defendants' misrepresentations about the monetary value of the stock options and the method of exercise, as well as the fraud arising from the false promise of employment.

The Complaint further pleads each Defendants' knowledge of those acts of fraud, alleging that "[e]ach of Defendants Marx and Klein were aware that the other as well as AJA Pack Holdings had misrepresented the value of the stock option component of the purchase price

for the asset purchase." [1] ¶ 120. The Complaint pleads that Defendants Marx and Klein were each aware that the other as well as AJA Pack Holdings had misrepresented Defendants' purported promise to employ Almimeh for three years as Vice Chairman and manager of the PupCulture brand. ¶ 121.

The Complaint alleges that "[e]ach of Defendants Klein and Marx provided substantial assistance to the other and to AJA Pack Holdings in fraudulently inducing Plaintiffs to sell the PupCulture assets for purchase consideration with a lower value than Defendants had represented and based on false representations about Defendants' intent for Mr. Almimeh's employment." ¶ 122.

Defendants blatantly mischaracterize the Complaint in aid of their attempt to dismiss Plaintiffs' cause of action for aiding and abetting. In a stunningly obvious untruth, Defendants assert that "Plaintiffs have not pled that Marx or Klein knew of the allegedly fraudulent valuation." Defs.' MOL p. 28 of 31. But this is pled clearly and repeatedly. ¶¶ 120, 51, 52, 103. Defendants' obvious misrepresentations to the Court must be firmly rejected.

With the same contemptuousness that characterizes their fraudulent conduct and much of their Motion, Defendants assert that Defendant Klein's admission of Marx's lies, Cmplnt. ¶ 76, "corrected" the alleged misrepresentations. Defs." MOL p. 28 of 31. This assertion finds no support in fact or in law and does not avail Defendants' Motion.

Defendants' Motion fails to justify dismissal of this cause of action.

[1] The Complaint inadvertently omitted to plead that each Defendant was aware of the misrepresentations regarding the method of exercise of the options, and Plaintiffs are prepared to add that allegation in an amended Complaint if deemed appropriate.

## V. THE COMPLAINT SUFFICIENTLY ALLEGES ITS FOURTH CAUSE OF ACTION FOR BREACH OF CONTRACT

Defendants move to dismiss the breach of contract claim on the premise that the Purchase Option Agreement unambiguously required a cash exercise payment and that enforcing that term defeats any breach as a matter of law. Defs.' MOL p. 11 of 31. This approach fails, in light of the Purchase Option Agreement's explicit permission to pay the exercise price with consideration other than money.

Under Delaware law, three elements comprise a breach of contract claim: "(1) the existence of a contractual obligation, (2) a breach of that obligation, and (3) damages as a result." *Fortis Advisors LLC v. Medtronic Minimed, Inc.*, 2023-1055-MAA, 2024 WL 3580827, at *5 (Del Ch July 29, 2024). The Complaint satisfies these elements and identifies the agreement, the counterparty, the performance Plaintiffs allege, the conduct said to constitute breach, and resulting damage. It alleges that Almimeh and Marx for AJA Pack Holdings executed the grant documents covering 981,344 options at closing; that Almimeh attempted to exercise 1,000 options without an outright cash payment on November 4, 2025; that AJA Pack refused to convert those options unless he paid $2.14 per share; and that Plaintiffs were damaged. Cmplnt. ¶¶ 65–68, 81, 125, 127–32.

Plaintiffs plausibly allege a breach here, because Defendants refused to permit the contractually authorized non-cash payment of the exercise price. The Purchase Option Agreement expressly authorizes "such other form of consideration and/or … method" as the Committee determines, subject to the Plan and law (Option Grant Agreement § H) The Complaint pleads that very authorization: "Payment of the Exercise Price shall be by any of the following, or a combination thereof: … such other form of consideration and/or pursuant to such method as the Committee shall determine …" Cmplnt. ¶ 68. On November 4, 2025, Plaintiffs

sought to exercise 1,000 options without paying cash; Defendants refused unless Almimeh first paid $2.14 per option. Cmplnt. ¶ 81. Defendants characterize their refusal as enforcing an unambiguous cash-only obligation, but the payment clause authorizes non-cash consideration or methods subject to Committee determination. Cmplnt. ¶ 68. At the pleadings stage, insisting on "cash only" despite § H's authorization of "such other form … and/or … method" plausibly states a breach because it nullifies the bargained-for flexibility (Option Grant Agreement § H).

Defendants' bare contention that cash was the only permissible method to pay the exercise price cannot override the contractual text authorizing other methods. On a motion to dismiss, Delaware courts interpret unambiguous contracts as a matter of law and read the instrument as a whole, giving effect to *all* terms. *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846–48 (Del. 2019). Courts avoid readings that render bargained-for provisions meaningless or illusory. Thus, a "cash-only" construction would effectively read § H's "such other form … and/or … method" out of the Agreement. When a motion to dismiss for failure to state a claim hinges on the interpretation of a contract, a trial court may only grant the motion if the defendant's interpretation of the contract is the only reasonable construction as a matter of law. *LGM Holdings, LLC v. Schurder*, 340 A.3d 1134, 1143 - 44 (Del. 2025).

Defendants conflate an obligation to satisfy the exercise price with an asserted obligation to tender only cash therefor. Defendants' insistence on cash only, fairly read in Plaintiffs' favor, raises the narrower issue of whether AJA Pack rejected a noncash exercise method in violation of the contractual provision allowing one. The Court should not decide that issue by reading Section H out of the documents.

Defendants rely on the integration/acknowledgment clause to refute this cause of action, but, because the alleged breach is Defendants' refusal to entertain a contractually permitted

method of payment of the exercise price and Defendants' insistence on "cash only," the integration clause cannot bar this claim.

Defendants further rely on the Option Grant Agreement's provision regarding committee discretion, but that discretion cannot be exercised to eviscerate Section H. Delaware law does not permit rewriting negotiated language to add limits not agreed—but also does not allow exercise of discretion in a manner that renders express terms illusory. Here, a categorical "cash-only" stance would nullify Section H's several options for payment of the exercise price.

Should the Court deem this cause of action inadequately pleaded, Almimeh requests permission to amend and plead a cause of action for breach of the covenant of good faith and fair dealing, in light of the plausibility that Defendants exercised their discretion under the Purchase Options Agreement in bad faith to deprive Almimeh of his right to pay the exercise price with the PupCulture assets.

## VI. THE COMPLAINT SUFFICIENTLY ALLEGES ITS FIFTH CAUSE OF ACTION FOR RESCISSION BASED ON LACK OF MUTUAL ASSENT.

The fifth cause of action seeks rescission of the APA in the alternative to enforcing the transaction documents. Cmplnt. ¶¶ 133–36. Plaintiffs do not seek both rescission and an award giving them the benefit of the same bargain. They seek a determination of their rights under the written agreements, and if the Court concludes that there was no objectively ascertainable agreement on a material part of the exchange, Plaintiffs request relief restoring the parties to their pre-transaction positions.

The inquiry on this cause of action is whether the parties assented to the asset sale, not whether the separately executed option grant can be rescinded under its Delaware choice-of-law provision. Defs.' MOL p. 16 of 31 fn.3; Cmplnt. ¶¶ 133–36. New York law applies an objective test: whether the parties' words and conduct manifested assent to sufficiently definite material

terms. *Wu v. Uber Technologies, Inc.*, 43 N.Y.3d 288, 298–300 (2024). A material disagreement can prevent formation where the written terms furnish a reasonable basis for materially different understandings. *Gessin Elec. Contractors, Inc. v. 95 Wall Associates, LLC*, 74 A.D.3d 516, 518–19 (1st Dep't 2010).

This cause of action identifies two competing interpretations of the APA and its underlying Option Agreements—whether or not exercise required out-of-pocket payment—and alleges that the difference was material to assent to the APA. Cmplnt. ¶¶ 134–36. Unlike a claim that simply recites "no meeting of the minds" without identifying the disputed term, Plaintiffs have identified the provision and the competing understandings. *Cf. D'Artagnan, LLC v. Sprinklr Inc.*, 192 A.D.3d 475, 476–77 (1st Dep't 2021). The Court should assess that allegation against the complete APA, option grant, and incorporated Plan before concluding that only one objectively reasonable understanding of the purchase consideration was possible.

Defendants correctly observe that the grant specifies an exercise price and reserves any other form or method of payment to the Committee's discretion. Defs.' MOL p. 11 of 31. Plaintiffs do not argue that a listed exercise price disappears because they expected not to pay cash. But those observations do not, without consideration of the whole transaction, resolve whether the parties objectively agreed to the same material exchange. Nor does the APA's entire-agreement language, cited at Defs.' MOL p. 25 of 31 fn.5, make an alleged failure of formation conceptually impossible. The critical question remains whether the governing agreements objectively manifested agreement, as distinct from a private expectation or a precontractual oral assurance, support Plaintiffs' theory.

The fifth cause of action requests rescission of the APA, a substantial remedy that would require addressing the transferred assets, consideration already paid, and whether the parties can be restored substantially to the status quo. Cmplnt. ¶ 136. The pleading should not be read as

establishing an automatic right to unwind the sale merely because the option documents may admit more than one construction. New York reserves relief from a completed agreement for a genuinely foundational defect; an unexpected diminution in the value of a bargained-for asset, without more, does not suffice. See *Simkin v. Blank*, 19 N.Y.3d 46, 52–55 (2012). At this stage Plaintiffs ask the Court to preserve the alternative theory if the complete transaction documents and pleaded formation-stage facts reasonably support a material failure of objective assent; if more particular allegations are deemed necessary, Plaintiffs alternatively request leave to amend to plead them.

## VII. THE COMPLAINT SUFFICIENTLY ALLEGES ITS SIXTH CAUSE OF ACTION FOR UNJUST ENRICHMENT

Defendants' argument treats the existence of signed agreements as dispositive, but the relevant question on the sixth cause of action is whether a valid and enforceable agreement governs the benefit for which restitution is sought. Under New York law, unjust enrichment requires a benefit to the defendant at the plaintiff's expense that equity and good conscience require the defendant to return or pay for. *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586–87 (2d Cir. 2006). A valid, enforceable contract covering that same subject matter ordinarily bars quasi-contract recovery; it does not, however, eliminate an alternative restitutionary theory if the agreement governing the exchange is found unenforceable or rescinded. *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388–89 (1987). Rule 8(d)(2)–(3) permits alternative and even inconsistent claims at the pleading stage.

The Complaint pleads that AJA Pack acquired the PupCulture business assets at the July 15, 2024 closing, and that the transaction included an option component represented as having $2.1 million in value at closing. Cmplnt. ¶¶ 23, 42–48. The Complaint alleges that AJA Pack

retained the transferred assets at Plaintiffs' expense and that equity and good conscience prohibit its retaining them without additional compensation. ¶¶ 137–40.

Defendants rely on *Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790–91 (2012), for the proposition that unjust enrichment cannot simply duplicate or repair a deficient contract or tort claim. That principle does not negate the pleaded alternative here: if the APA is rescinded or held unenforceable on the grounds pleaded in the Fifth Cause of Action, Defendants must be adjudged liable for the enrichment the have gained at Plaintiffs' expense.

Accordingly, the Court should deny dismissal of the sixth cause of action at this stage, without prejudging whether Plaintiffs can establish grounds to set aside the APA or the measure of any restitution. Plaintiffs seek alternative, not double, recovery; any award must account for consideration already received and any restoration required upon rescission. Cmplnt ¶¶ 133–40.

## VIII. THE COMPLAINT SUFFICIENTLY ALLEGES ITS SEVENTH CAUSE OF ACTION FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING.

Defendants mischaracterize the thrust of the seventh cause of action for breach of the covenant and offer inapposite arguments and caselaw. Defendants once again try to mislead this Court by asserting that Plaintiffs cause of action is alleged to arise form Defendants' refusal to explain in detail their reasoning for the "for Cause" termination. Defs.' MOL p. 18 of 31. But this completely misses point.

Almimeh's claim is that, while the Employment Agreement granted AJA Pack "discretion" to the characterize employment termination as "for Cause," AJA Pack abused that discretion in bad faith by unjustly so characterizing the employment termination, and AJA Pack did so specifically in order to divest Almimeh of his stock options and intimidate him from pursuing his claims, all in breach of the Covenant of Good Faith and Fair Dealing under Delaware law. Such a claim is without doubt cognizable under Delaware law.

Courts interpreting Delaware law have repeatedly held that the Covenant of Good Faith and Fair Dealing squarely prohibits an employer from exercising its discretion in bad faith to characterize termination as "for Cause" in order to deprive an employee of equity.

In *Sheehan v AssuredPartners, Inc.*, CV 2019-0333-AML, 2020 WL 2838575 (Del Ch May 29, 2020), the Chancery Court held that a claim just like Almimeh's here could proceed and held that arguments just like Defendants' here did not prevail. The plaintiffs in *Sheehan* had alleged his employer breached the covenant "by determining in bad faith that the Sheehans were terminated for cause," *id*. at *14, and had "terminated the Sheehans 'in order to steal [their] Class B Profits Interests.'" *Id.* at *11. The *Sheehan* court noted that "[t]o sufficiently plead breach of the implied covenant of good faith and fair dealing, a complaint 'must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.'" *Id*. at 11. The court further noted that the Sheehans had "identifie[d] a possible gap, specifically that a termination will not be done in "bad faith." *Id.* Finally, the court noted "To survive a motion to dismiss, however, the Sheehans only must allege that the termination decision was motivated by an improper purpose." *Id*. The court held the Sheehans' complaint did just that and green-lighted the claim for breach of the covenant.

Similarly, in *Smith v Scott*, CV 2020-0263-JRS, 2021 WL 1592463 (Del Ch Apr. 23, 2021), the plaintiff like Almimeh here alleged "that Defendants ginned up a for-cause termination as a means to strip him of his Vested Interests and thereby breached the covenant of good faith and fair dealing." And, like Defendants here, the *Smith* defendants argued that the claim failed on its face because it depended on matters "fully and expressly addressed by written contract." *Id.* at *6. The court noted that "The Covenant embodies the law's expectation that each party to a contract will act with good faith toward the other with respect to the subject matter of the contract.' And it prevents a party from using an agreement as a shield to deny the

other party the fruits of the bargain where the first party engages in bad faith conduct." *Id*. The Court went on, citing *Sheehan*, to hold that plaintiff had adequately stated a cause of action for breach of the covenant by alleging defendants had "violated the Covenant by purporting to fire Smith for cause when, in fact, their sole motivation was to take his Vested Interests without compensation." *Id*.

Almimeh's claim here is just like the claims at issue in *Sheehan* and *Smith*, and Almimeh therefore adequately states a cause of action for breach of the covenant of good faith and fair dealing.

Defendants yet again try to mislead this Court by asserting that "Plaintiffs have not pled facts sufficient to state a plausible claim that the Cause determination was in bad faith or pretextual." Defs.' MOL p. 19 of 31. This assertion is simply false. Almimeh pleads that he "has not breached any provision of his employment agreement with AJA Pack Holdings or engaged in any conduct that would satisfy any of the elements of a 'for Cause' termination." Cmplnt. ¶ 93. To corroborate this allegation, Almimeh notes that AJA Pack "provided no factual support for that characterization, despite Mr. Almimeh's request for an explanation." ¶ 90, 94. The Complaint further notes that Defendants' for-cause characterization "deprived Mr. Almimeh of what little value was contained in the options he was granted," and that "Defendants' unjustified termination also deprived Mr. Almimeh and his wife and two daughters of the health insurance coverage that came with his employment. The Complaint notes that the for-cause termination resulted in a purported forfeiture of all options granted or vested "without payment of consideration therefore." ¶ 92.

These allegations are analogous and practically identical to the allegations in *Sheehan* and *Smith*, and are sufficient to state a claim for breach of the covenant under Delaware law.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss in its entirety, and that the Court grant such other and further relief as is deemed just and proper. If the Court finds that any aspect of the Complaint is inadequately pleaded, Plaintiffs respectfully request leave to amend.

Dated: New York, New York
September 30, 2026

HEERDE LAW PLLC

/s/ Matthew C. Heerde

By: Matthew C. Heerde
48 Wall Street 31st Floor
New York, NY 10005
Tel: 347-460-3588
Fax: 347-535-3588
Email: mheerde@heerdelaw.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF WORD COUNT

I certify that the accompanying brief, which was prepared using Times New Roman, 12-point typeface, contains 8,325 words, in compliance with Joint Local Civil Rule 7.1(c). This certificate was prepared in reliance on the word count function of the word processing system (Microsoft Word) used to prepare the document.

Dated: New York, New York
September 30, 2026

HEERDE LAW PLLC

/s/ Matthew C. Heerde

By: Matthew C. Heerde
48 Wall Street 31st Floor
New York, NY 10005
Tel: 347-460-3588
Fax: 347-535-3588
Email: mheerde@heerdelaw.com
*Attorneys for Plaintiffs*