UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IBRAHIM ALMIMEH, et al,<br><br>Plaintiffs,<br><br>v.<br><br>AJA PACK HOLDINGS, INC, f/k/a PELLA SOLUTIONS, INC., JOSHUA MARX, and ALEX KLEIN,<br><br>Defendants. | 26-cv-5919(JSR)<br><br>OPINION AND ORDER |

JED S. RAKOFF, U.S.D.J.:

Before the Court is the motion of the defendants, AJA Pack Holdings, Joshua Marx, and Alex Klein, to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6). See ECF No. 17. The plaintiffs oppose the motion and request, in the alternative, to be granted leave to amend. The motion was fully briefed on October 7, 2026, see ECF Nos. 17-19, and the Court held oral argument on October 13. For the reasons that follow, the Court grants the defendants' motion. However, the Court grants the plaintiffs request for leave to amend.

## I. Factual Allegations

Ibrahim Almimeh, the individual plaintiff in this case, founded a dog daycare business called PupCulture in 2002.[1] See

[1] For purposes of the instant motion, the Court assumes the truth of the plaintiffs' non-conclusory allegations. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

ECF No. 1 ¶ 4 ("Compl."). The individual defendants, Klein and Marx, are partial owners and principal officers in a small private equity firm, AJA Pack Holdings ("AJA Pack"). Id. ¶¶ 1, 24-26. In early 2023, Klein and Marx approached Almimeh with a proposal to purchase his business for $6.7 million in cash and outright common stock in AJA Pack. Id. ¶ 5. This understanding was memorialized in a letter of intent drafted in December of 2023. Id. ¶ 33.

In February of 2024, Marx, Klein, and Almimeh met again, and the defendants revised their offer to a total purchase price of $5.1 million, including $3 million in cash and a grant of common stock in AJA Pack with an estimated $2.1 million value. Id. ¶ 36. In March of 2024, the defendants again revised the proposal, offering to pay $3 million in cash and a grant of stock options that the defendants represented to have a value of $2.1 million. Id. ¶ 37. Ultimately, on March 27, 2024, the parties reached a deal and executed an Asset Purchase Agreement ("APA"). Id. ¶ 6. The parties closed the sale of PupCulture on July 15, 2024. Compl. ¶ 65.

As relevant here, the APA provided that Almimeh would receive $2.7 million in cash and a stock option grant for 981,344 common shares in AJA Pack. See ECF No. 17-4 §§ 2.05(a), 3.02(a)(vi). The grant of stock options under the APA was governed by a separate Stock Option Grant Agreement ("SOGA").

See ECF No. 17-6. The SOGA specified a vesting date of October 15, 2024, and an exercise price of $2.14 per share. Id. at 1. The SOGA also provides that payment of the exercise price may be made by cash, certified bank check, or "such other form of consideration and/or pursuant to such method as the Committee shall determine in its sole and absolute discretion, provided that such form of consideration and/or method is permitted by Section 5(b)(v) of the Plan and by applicable law." Id. § G.

In the main, Almimeh alleges that Klein and Marx made two material representations about the terms of the sale of PupCulture, both of which concern the grant of stock options in AJA Pack. First, Almimeh alleges that Klein and Marx misrepresented the value of the stock options he would receive under the APA. He contends that, in the months leading up to the execution and closing of the deal, Klein and Marx led him to believe the present value of the stock options at the time of purchase was $2.1 million. See, e.g., Compl. ¶¶ 38, 40. However, shortly after closing, the defendants gave Almimeh access to AJA Pack's profile on the "Carta platform," which indicated that AJA Pack's stock was worth only a fraction of that value. Id. ¶ 66.

Second, Almimeh alleges that Klein and Marx represented to him that he would be able to exercise his stock options without having to pay an exercise price. See, e.g., Compl. ¶ 39. However, in November 2025, Almimeh attempted to exercise 1,000

of his options and the defendants informed him that to do so he would have to pay a $2.14 per-option exercise price. Id. ¶ 81.

Almimeh alleges that because of these two misrepresentations – concerning the value and exercise mechanism of the options he received as part of the purchase price for PupCulture – he was misled into accepting substantially less compensation than he reasonably believed he was receiving. Id. ¶ 83.

Finally, and separate from these two alleged misrepresentations, Almimeh alleges that the parties entered an employment agreement at the time of closing "pursuant to which AJA Pack hired Mr. Almimeh as "Vice Chairman and manager of the PupCulture brand and operations." Id. ¶ 84; see ECF No 17-5 ("Employment Agreement"). The defendants agreed to pay Almimeh a salary of $125,000 per year for three years and issued an additional grant of 140,192 stock options. Id. Almimeh alleges that the defendants never intended to honor this agreement and that they almost immediately took steps to shut him out of PupCulture and AJA Pack. Id. ¶¶ 86-88. On January 30, 2026, AJA Pack terminated Almimeh's employment "for cause" but did not provide any basis for the termination. Id. ¶¶ 85-97. Almimeh alleges that this was an effort to strip him of his vested options before he could exercise them.

Almimeh brings seven claims: (1) violation of Securities Exchange Act § 10(b) and Rule 10b-5; (2) fraudulent inducement; (3) aiding and abetting fraudulent inducement; (4) breach of contract; (5) lack of mutual assent; (6) unjust enrichment; (7) breach of the covenant of good faith and fair dealing. Id. ¶¶ 98-144. The first two claims are brought against all three defendants, the third claim is brought against just Klein and Marx, and the remaining four claims are brought against just AJA Pack.

The defendants moved to dismiss these claims under Fed. R. Civ. P. 12(b)(6). See ECF No. 17. For the reasons that follow, the Court grants that motion, but allows the plaintiffs leave to amend.

## II. Legal Standard

To survive the defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(6), Almimeh's pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[2] Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

[2] Except where otherwise indicated, all quotations in this Opinion omit citations, quotation marks, footnotes, brackets, ellipses, and other non-substantive alterations in source material.

suffice." Id. Importantly, "[a] pleading is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." Doe v. Bank of Am., N.A., 819 F. Supp. 3d 314, 326 (S.D.N.Y. 2026). Here, in resolving the instant motion, the Court may consider Almimeh's complaint, as well as the APA, SOGA, and Employment Agreement.

**III. Analysis**

**A. Exchange Act**

The Court begins its analysis with the plaintiffs' claim under § 10(b) of the Securities Exchange Act and its implementing regulation, Rule 10(b). As an initial matter, "standing to bring a claim under Section 10(b) is limited to purchasers or sellers of securities about which a misstatement was made." Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd., 54 F.4th 82, 84 (2d Cir. 2022). This threshold rule is fatal to the Exchange Act claims brought by the five PupCulture plaintiff entities.

The complaint alleges, and the SOGA reflects, that Almimeh was the "Optionee" entitled to the AJA Pack options. See SOGA at 1. Neither the complaint nor the incorporated agreements suggest that any of the other plaintiff entities were purchasers or sellers of securities for purposes of the Exchange Act.

Accordingly, the Court dismisses Count One as to the five PupCulture plaintiffs.

Turning to Almimeh's Exchange Act claim, to state a claim under § 10(b), a plaintiff must "plead: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation." Ark. Pub. Emp. Ret. Sys. v. Bristol-Myers Squibb Co., 28 F.4th 343, 351-52 (2d Cir. 2022). Under Fed. R. Civ. P. 9(b), and the Private Securities Litigation Reform Act ("PSLRA"), "allegations of material misstatements must be stated with particularity and must specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading." Id. at 353; see 15 U.S.C. § 78u-4(b)(1).

Almimeh identifies two categories of material misstatements that, he alleges, state a claim under § 10(b). First, he argues that Klein and Marx repeatedly misrepresented the exercise mechanism for his stock options. Put simply, he argues that he was led to believe he could exercise his stock options for free, and that he only agreed to the APA based on this understanding.

But the plain terms of the SOGA contradict Almimeh's alleged understanding of the exercise mechanism. The very first sentence of the SOGA states that it "grant[ed] to [Almimeh] an option to purchase the number of shares of [AJA Pack's] Common

Stock." SOGA at 1. The first page of the SOGA goes on to identify an exercise price of $2.14 and a schedule for exercise of these shares. Id. Later, in the section titled "Method of Exercise," the SOGA provides that the "Option shall be deemed to be exercised upon receipt by [AJA Pack] of the fully executed Exercise Notice accompanied by the aggregate Exercise Price." Id. § G. and, as summarized above, the SOGA provides three methods of payment: (1) cash; (2) certified or bank check; or (3) "any other form of consideration and/or pursuant to such method as the Committee shall determine in its sole and absolute discretion." Id. § H. In other words, the SOGA unambiguously requires payment to exercise the options.

Almimeh argues that the third method of payment, found in § H(3), can be read to essentially encompass non-payment. To thread this needle, he contends that § H(3) allows "consideration other than money — such as the PupCulture business assets tendered by" Almimeh. ECF No. 18, at 6. The Court finds this read of the contract to be completely implausible. Almimeh tendered the PupCulture assets pursuant to the APA in exchange for, among other things, cash and stock options. There is nothing in the APA or the SOGA that suggests those same assets were also compensation for any unspecified future exercise of the AJA Pack options.

Faced with the plain terms of the contract to which he agreed, Almimeh alleges that Klein and Marx made a series of statements made to him that gave him the false impression that he would be able to exercise his options without paying the exercise price. For example, Almimeh alleges that Marx told him he "could 'tap into the value of [his] equity if [he] need[s] any liquidity' and thus could exercise the options without paying any cash out of pocket." Compl. ¶ 39. Almimeh also alleges that Klein texted him, "'my goal is to turn your $2.1M of Pella stock into 10M,' giving Mr. Almimeh the understanding that the stock options ultimately represented the same value as outright common stock." Id. ¶ 40.

On their face, it is not clear that either of these statements qualify as a misstatement. In any event, the APA and SOGA were unambiguous. Almimeh agreed to these terms while represented by counsel. See APA § 10.02. Even if certain statements made by Klein and Marx may have left Almimeh with the impression that he would be able to exercise his options without paying an exercise price, no reasonable investor would have retained that belief when presented with the terms of the APA and SOGA. Accordingly, Almimeh has not sufficiently alleged any materially misleading statements with respect to the exercise mechanism of the AJA Pack stock options. See Rombach v. Chang, 355 F.3d 164, 172 n.7 (2d Cir. 2004) ("The test for whether a

statement is materially misleading under Section 10(b) and Section 11 is whether the defendants' representations, taken together and in context, would have misled a reasonable investor.").

The second category of alleged misrepresentations relates to the value of the stock options and, correspondingly, the value of the underlying shares. Almimeh alleges that the defendants fraudulently misrepresented the value of AJA Pack stock, leading him to believe that the share price was $2.14, when in reality it was a fraction of that price. There are two statements to which Almimeh points to support this allegation. First, he alleges that Marx told him, before signing the APA, that the options would have "the exact value as the stock." Compl. ¶ 38. Second, Almimeh alleges that Klein told him, "my goal is to turn your $2.1M of Pella stock into 10M." Id. ¶ 40. Additionally, Almimeh alleges that the "Deal Summary" prepared by the defendants and shared with him before the parties signed the APA "represented that these 981,344 options had a dollar value of $2,100,000," and "stated that the value of the stock options was '$2,100,000 At Close.'" Compl. ¶¶ 43-45. While the APA did not make any representation as to the value of the options, Almimeh argues that the Deal Summary was a misrepresentation by Klein and Marx as to their value.

Almimeh argues that these statements were misleading in two respects. First, he argues that the only way for the value of the options to have been 2.1 million dollars — as the defendants allegedly represented it to be — was if the exercise price on the options was effectively zero dollars. For the reasons already discussed, this argument concerning the exercise price fails.

Second, and more plausibly, Almimeh argues that these statements as to the value of the options conveyed misleading information as to the present value of the underlying shares in AJA Pack. While the foregoing statements could not have mislead a reasonable investor as to the exercise mechanism of the AJA Pack options, such an investor might reasonably have inferred that the $2.14 option price reflected the then-present value of the underlying shares. If in fact these representations were false when made, they could constitute material misstatements for purposes of § 10(b).

However, Almimeh's allegations with respect to these statements fall well short of stating a claim under § 10(b). Beyond the single allegation concerning his review of an online platform in July 2024, Almimeh does not make any concrete allegations concerning the actual price of AJA Pack shares. See Compl. ¶ 66. This single allegation is too thin a reed on which

to conclude that the foregoing statements were false or misleading when made.

Moreover, even if this allegation were sufficient to establish a material misstatement, the complaint fails to allege that the defendants possessed the requisite scienter with respect to such statements. To survive dismissal under the PSLRA, a plaintiff must plead particularized facts giving rise to a "strong inference of fraudulent intent," or "reckless disregard for the truth." S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 108-09 (2d Cir. 2009). In view of the extremely limited allegations concerning the actual value of AJA Pack shares, the complaint fails to allege either that the defendants acted with fraudulent intent or with reckless disregard for the truth.

To be sure, the complaint is not devoid of allegations that could support a finding that the defendants had the requisite scienter. For instance, the complaint alleges that Klein told Almimeh, months after closing, that Marx "lied to [Almimeh]" and "set [Almimeh's expectations out the window." Compl. ¶ 76. However, these statements are too general, on their own, to support the inference that the defendants misrepresented the then-present value of AJA Pack shares and did so with fraudulent intent or with reckless disregard for the truth.

In sum, the Court dismisses Count One of the complaint as to the five PupCulture plaintiffs for failure to allege standing under § 10(b). Further, the Court dismisses Almimeh's § 10(b) claim for failure to allege a material representation or the required scienter for purposes of the Exchange Act. However, "[w]hen a court grants a motion to dismiss, it is often appropriate to grant leave to amend the complaint—particularly when Rule 9(b) applies." S.E.C. v. One or More Unknown Traders in Sec. of Onyx Pharms., Inc., 296 F.R.D. 241, 244 (S.D.N.Y. 2013). Because the Court concludes that amendment would not be "necessarily futile," id., the Court grants the plaintiffs leave to file an amended complaint within 14 days of the date of this Opinion.

**B. State Law Claims**

Having dismissed the plaintiffs' sole federal claim, the Court must determine whether to exercise supplemental jurisdiction over the remaining state-law claims.[3] "In the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent

---

[3] The plaintiffs have not asserted diversity jurisdiction as to the state-law claims, see Compl. ¶ 27, nor could they. The complaint alleges that Almimeh is a citizen of New Jersey and that the PupCulture plaintiffs are citizens of New York. See id. ¶¶ 17-22. It further alleges that AJA Pack is a citizen of Delaware and New York, and that Klein and Marx are citizens of New York. Id. ¶¶ 23-25. Thus, the parties lack complete diversity.

jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 727 (2d Cir. 2013). This is the usual case. The federal-law claim was "eliminated on a motion to dismiss, prior to the investment of significant judicial resources," and the Court sees "no extraordinary inconvenience or inequity occasioned by permitting the claims to be refiled in state court where they will be afforded a surer-footed reading of applicable law." See Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 123-24 (2d Cir. 2006).

The Court therefore dismisses the remaining state-law claims. This dismissal is without prejudice to the plaintiffs bringing these claims in state court or raising them in an amended complaint before this Court. See id.

## IV. Conclusion

For the foregoing reasons, the Court dismisses the complaint in its entirety but without prejudice to plaintiffs' seeking to revive it through an amended complaint to be filed within 14 days of the filing of this Opinion. The Clerk of Court is respectfully directed to close the docket entry at ECF No. 17.

SO ORDERED.

New York, NY
October 26, 2026

JED S. RAKOFF, U.S.D.J.